**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARVIN PETE WALKER, *Petitioner-Appellee,* v. MICHAEL MARTEL, Warden, *Respondent-Appellant.* | No. 11-99006 D.C. No. 4:94-cv-01997-SBA OPINION |

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
December 4, 2012—San Francisco, California

Filed March 7, 2013

Before: Barry G. Silverman, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Silverman;
Partial Concurrence and Partial Dissent by Judge Gould

# SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel reversed the district court's grant of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder and related crimes.

Petitioner Walker contended that trial counsel provided ineffective assistance by failing to object to the use of a knee restraint on one of Walker's legs under his pants, which jurors noticed because it made Walker limp. The panel held that, under *Strickland v. Washington*, 466 U.S. 668 (1984), and given the strength of the evidence, the nature of the brace, the atrociousness of Walker's crimes, and the quality of the mitigation, the California Supreme Court could conclude that it was not reasonably probable that either Walker's conviction or sentence would have been different had counsel objected to the use of the leg restraint. The panel remanded for the district court to consider other claims held in abeyance pending this appeal.

Judge Gould concurred in the majority's holding as to the guilt phase. However, he would affirm the district court's grant of relief as to the sentence so that Walker could receive another penalty-phase trial at which he is not improperly shackled so that the jury can weigh the aggravating factors relating to his crimes against the mitigating factors of his

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

youth and family relationships before deciding if he is
eligible for the death penalty.

---

## COUNSEL

Bruce Ortega, Deputy Attorney General, San Francisco,
California, for Respondent-Appellant.

Thomas B. Mayhew (argued) and Douglas R. Young
(argued), Farella Braun + Martel, LLP, San Francisco,
California; Nanci L. Clarence, Clarence Dyer & Cohen, LLP,
San Francisco, California, for Petitioner-Appellee.

---

## OPINION

SILVERMAN, Circuit Judge:

Warden Michael Martel appeals the district court's grant
of habeas relief under 28 U.S.C. § 2254 to Petitioner-
Appellee Marvin Walker. During just one month in 1979,
Walker committed two armed robberies in San Jose,
California, in which he shot and attempted to kill four people.
He shot most of the victims in the head, killing a 15-year-old
boy and permanently injuring the three remaining individuals.
Three weeks after the second robbery, Walker sold the
murder weapon to a police officer who had been working
undercover purchasing stolen property. Walker told the
officer that the gun had been in his possession for months,
had made him a lot of money over the last six months, and
"had done a murder."

He was convicted of first-degree murder, three counts of assault with intent to commit murder and other charges, and sentenced to death in 1980.  During his trial, the sheriff's office placed a knee restraint on one of Walker's legs under his pants.  It is undisputed that several members of the jury became aware of it.  Jurors noticed the restraint during trial because it made Walker limp to and from the witness stand when he testified during both the guilt and penalty phase.  No record was made of the need for such a restraint, and Walker's lawyer made no objection to the knee brace. On direct appeal, the California Supreme Court held that any objection to the use of the brace had been waived by the failure to object at the time.  *People v. Walker*, 765 P.2d 70, 83 (Cal. 1988).

Claims of ineffective assistance of counsel raised in the state habeas petitions were denied without explanation.  In his subsequent federal habeas petition, Walker claimed that defense counsel was ineffective for failing to object to the knee restraint.  The district court agreed, holding that the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Walker v. Martel*, 803 F. Supp. 2d 1032, 1044–53 (N.D. Cal. 2011).  The district court ruled that the only reasonable conclusion to draw from the record was that counsel was constitutionally deficient in failing to object to the restraint and that Walker was prejudiced thereby.  The warden now appeals, challenging only the district court's ruling on the prejudice prong of *Strickland*.

Because the California Supreme Court did not provide an explanation for its denial of Walker's ineffective assistance of counsel claim, our obligation under the Antiterrorism and Effective Death Penalty Act of 1996 is to determine whether the state court decision, even sans explanation, was "contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 131 S. Ct. 770, 785–86 (2011).  The Supreme Court has stated that:

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, *could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Id*. at 786 (emphasis added).  For the following reasons, we hold that the state court reasonably could have applied *Strickland* to decide that Walker was not prejudiced by the knee restraint.

- First, although members of the jury became aware of the knee brace, it was at all times worn under Walker's clothing and was relatively unobtrusive compared to unconcealed leg irons, handcuffs secured to belly chains, gags, and being bound to a chair, as occurred in other cases.

- Second, because Walker's hands were unencumbered, the restraint here signified custody status rather than dangerousness, and the fact that Walker was in custody during the trial was something he himself voluntarily introduced into evidence.

- Third, the judge indicated to the jury that the brace was a more-or-less routine measure taken

by the sheriff for all persons in custody. The judge's comments went a long way toward dispelling any impression that Walker posed a unique danger in court.

- Fourth, the evidence of Walker's guilt was strong. He was identified by two of the survivors of the shootings. These identifications were powerfully corroborated by his attempt to sell the very weapon used in *both* episodes to an undercover police officer less than three weeks after the second robbery.

- Fifth, the jury *acquitted* Walker of assaulting with intent to murder a customer who entered the store while the robbery was in progress. This is compelling proof that the jury could evaluate the evidence fairly and was not blinded by the brace.

On this record, the state court reasonably could conclude that it was not reasonably probable that the jury would have acquitted Walker had Walker's counsel objected to the restraint.

This is true for the penalty phase as well. The magnitude of Walker's crimes was enormous. During the first armed robbery, he shot three store employees, two of them execution-style in the head, and killed a 15-year-old. During the robbery, Walker said he wanted the victims killed to eliminate any witnesses. In the second incident, Walker sexually molested a 20-year-old woman at gunpoint by ripping open her blouse and touching her breasts, then pistol-whipped her approximately 12 times, and shot her twice, once in the eye and once through her left ear. She lost her eye and

the hearing in one ear, and suffered a fractured neck.  In the face of these horrendous crimes, Walker's mitigation evidence consisted of the fact that he was 19 years old at the time of the offenses, had no prior criminal record, had done yard work for a church secretary in the past, gave a friend rides to work, provided financial and emotional support to his mother and sister, and was loved by them and his girlfriend.

The California Supreme Court did not unreasonably apply or act contrary to Supreme Court law in deciding, as it necessarily did, that the restraint Walker was required to wear under his pants during the penalty phase was trivial in comparison to the magnitude of his crimes, taking into account the nature of the mitigation evidence presented to the jury.  Put another way, we cannot say that the California Supreme Court was unreasonable in deciding that it was not reasonably probable that Walker would have been spared the death penalty had his counsel objected to the knee restraint.

We reverse the district court's granting of the writ, and we remand for the district court's consideration of the other claims it held in abeyance.

## I.  Factual Background

### A.  The Crimes

#### 1.  August 6, 1979 Incident

We take the facts of Walker's crimes and the ensuing investigation mainly from the California Supreme Court's 1989 opinion affirming Walker's conviction on direct appeal. Our "review is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v.*

*Pinholster*, 131 S. Ct. 1388, 1398 (2011).  The state court's factual findings are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *Frost v. Van Boening*, 692 F.3d 924, 929 (9th Cir. 2012).

On August 6, 1979, Walker entered Dan's Bottle Shop in San Jose, California, accompanied by another individual.  In the store were co-owner Jerry Romero and two young employees, Joe Vasquez and Andy Zamora.  Walker drew his gun, announced that he was holding up the store, and marched Romero, Vasquez, and Zamora at gunpoint into the back room.  Walker ordered Romero to open the safe.  When Romero replied that he did not have the combination, Walker grabbed a claw hammer and threatened to strike Romero with it.  Walker's companion told him to "wait a minute," searched Romero's wallet unsuccessfully for the combination, and then told Walker, "He doesn't know it, just forget it."  Walker's companion returned Romero's wallet.

The front door bell then sounded, indicating that a customer had entered the store, and Walker instructed Vasquez to wait on the customer, threatening that if he made any "funny moves," he would be shot.  Walker observed from the top of some storage shelves.  After the transaction, the customer left, and Walker and his companion moved the group to the front of the store.  Walker opened the cash register and removed approximately $150.  His companion said, "Come on. We got the money. Let's get out."  Walker replied, "No.  We're not going to leave any witnesses."

Walker proceeded to march the staff into the back room again.  Walker handed his gun to his companion, took a nearby wine bottle in hand, and struck Romero across the

forehead with it.  As Romero fell, Walker struck him with a second wine bottle.  Romero lay on the floor and pretended to be dead.  Walker then lifted Romero's wallet, felt Romero's back, and stated "We don't have to worry about this guy any more."

Walker next ordered Vasquez and Zamora on their knees, and they complied.  Romero heard them crying and pleading for their lives.  Three shots were fired in quick succession. Neither Romero nor Zamora observed who fired the shots. As Walker and his companion fled, Romero heard the customer bell and the sound of a bottle breaking in the front of the store.  He rose, saw the two boys lying in their own blood, walked to the rear door, and witnessed Walker get into a car in which his companion was already seated.

Vasquez died of a .32 caliber gunshot wound which entered his forehead and exited through the back of his head. The chief medical examiner testified for the prosecution that the entry and exit wounds were consistent with the gun pointing down at the victim. Zamora was shot in the head but survived.  Romero was shot in the abdomen; the bullet ricocheted off his hip and passed through several major organs before lodging in his chest.  At the time of trial, the bullet remained lodged in Romero's chest.

Romero testified that he was familiar with firearms.  He described the weapon used by the shooter as smaller than a .38.  Romero identified the murder weapon in court as similar to the gun Walker carried.  Police recovered several .32 caliber shell casings from the robbery scene.

Romero provided detailed descriptions of both robbers to the police, including height, weight, hair and eye color, skin

tone, hats, and clothing.  He described the robber with the gun as 5 feet, 10 or 11 inches tall, with 2-to-3 inch hair braids, no glasses, a moustache, spotty facial hair, and a nose that had a lump and was out of proportion to his face.  He was wearing a cowboy hat, a beige zippered jogging top with dark brown rings on the shoulders and armpits, a tank top t-shirt, pants with a string, and dirty high-top athletic shoes.  Romero gave a similarly detailed description of the taller accomplice. Police created composite sketches of the robbers based on Romero's description.  The composite drawn from Romero's description of the robber with the gun was admitted into evidence for the jury to consider.

### 2.  September 5, 1979 Incident

The second incident occurred late in the evening on September 5, 1979.  Walker entered a medical building in San Jose and pointed a gun at 20-year-old Rose Olveda.  He ordered Olveda to open the safe, but she responded that there was no safe on the premises.  Walker then ordered her into the back room, where he demanded her money and car keys. Olveda handed him $11 and the keys.  He told her to lie down so he could tie her up, but could not find anything to use. Walker ordered her to stand up again, ripped open her blouse, and touched her breasts.  He then pistol-whipped her on and about her head an estimated 12 times before she could break away and run for the door.  Walker pulled Olveda back and continued beating her, injuring her back and fracturing her neck.   She finally fell to the floor and feigned unconsciousness.  Walker then shot her in the head twice, with one bullet passing through her left ear, head, and jaw and ultimately lodging in her neck, and the other passing through her left eye, traveling downward and lodging in her throat.  Though she survived, she lost her left eye and the

hearing in her left ear. She also had scars on her face from the pistol-whipping.

Olveda described Walker as black; around 5'9", about two inches taller than herself; slender; and wearing Adidas-type athletic shoes, a t-shirt, pants, a ski cap, and a white cloth tied on his face. Police recovered several .32 caliber shell casings from the scene.

### 3. The Investigation

Within five hours of the second incident, police located Ms. Olveda's car parked close to Walker's sister's residence on Carmen Court. When he was arrested, Walker told police he was living on Carmen Court.

That same year, Officer Evan MacIvor had been conducting an undercover sting operation in San Jose, impersonating a businessman who bought stolen property. On September 26, 1979, just three weeks after the robbery and shooting of Rose Olveda, Walker contacted MacIvor and sold him a .32 caliber semi-automatic pistol. He informed MacIvor that the gun belonged to him, but that he had purchased a newer .22 caliber automatic gun, so he did not need it anymore. MacIvor purchased the gun for $25 and turned it over to the police department crime lab.

MacIvor met Walker again on September 28, 1979, and told him that the gun Walker sold him did not work. Walker responded that the gun did in fact work and demonstrated how to use it, explaining that he needed to "release the trigger after firing each round" because it was semi-automatic. He added that it had helped him make a lot of money over the prior six months. Walker added that MacIvor should not get

caught with it in his possession, because it "had done a murder." When pressed, Walker attributed this murder to a friend and prior owner who was now serving time in Soledad prison.

When they next met on October 2, 1979, MacIvor secretly recorded their conversation. Walker informed MacIvor that the gun had been used to commit a murder in Salinas and that the perpetrator was serving time for the offense. When MacIvor asked why he had held on to the gun for as long as he did, Walker replied that the murderer asked him to dispose of it. He had picked up the gun, oiled it down, and buried it in the ground.

## B. Trial

The state charged Walker with first-degree murder of 15-year-old Vasquez; assault with intent to murder Romero, Zamora, and Guerrero; robbery of Romero; assault with intent to murder Olveda; robbery of Olveda; and theft of Olveda's vehicle. The state alleged that Walker personally used a firearm for all of the offenses and alleged one special circumstance under the 1978 death penalty law, that the murder was committed during a robbery.

### 1. Guilt Phase

The prosecution primarily relied on two eyewitness identifications, the testimony of an acquaintance of Walker, a neighbor's testimony, and the comparative analysis of the spent shell casings and the firearm sold to Officer MacIvor. Both Romero and Olveda positively identified Walker at

lineups and at trial.  *Walker*, 803 F. Supp. 2d at 1051.[1]
Romero had previously identified him at a physical lineup.
At the second of three lineups, Romero testified, he identified
Walker "[a]s soon as he walked in."  He stated, "I knew it
was Mr. Walker. There was no question about it."  He also
recognized Walker's voice at the lineup.  Romero identified
Walker as the robber with the gun several times in court.
Even though Walker was wearing a ski mask during the
second robbery, Olveda positively identified Walker as her
assailant at one of two physical lineups and at trial.  Olveda
testified that she recognized Walker mostly by his eyes, but
also by his body type, height, build, skin tone, and voice.
Another witness for the prosecution, William Sisco,[2] testified
that at a party in late September 1979, he had heard Walker
brag about killing someone during a robbery.  Walker had a
gun in the waistband of his pants at the time.

Five hours after the assault, police found Olveda's car in
a carport near Walker's sister's residence on Carmen Court.
Upon his arrest, Walker told police he was living on Carmen
Court.  Walker's brother, Johnnie, testified that Walker lived
with their sister on Carmen Court, their mother, and Walker's
girlfriend, Denise Jackson, in 1979.  Johnnie admitted that he
told the police that he had seen his brother with the gun a few
times in early August 1979.

Additionally, a neighbor of the store, Harold Matlock,
testified that he was on his third-floor apartment balcony
around 10:30 p.m. or 11:00 p.m. when he heard what sounded

---

[1] The third shooting victim, Zamora, had a pre-existing mental disability,
was barely able to testify, and was not asked to make an identification.

[2] In some places in the record the name is spelled "Cisco."

like a firecracker.  He leaned over his balcony and looked down to see two black men exit the liquor store and drive away.  He saw the car only from the top and described the car to police as a heavily oxidized, rust or tan, 1965 or 1967 four-door Chevy Nova with a 4 and an 8 in the license plate number and a rear dent.  Matlock later identified Walker's car as similar to the car he had seen.  Walker's car, in actuality a 1967 Rambler, had the same body style, oxidized color, and rear dent as the vehicle Matlock described to the police.  Walker's license plate also contained both numbers provided by Matlock, 4 and 8.  However, Walker's car had four doors, not two.

Enrique Guerrero, the customer, testified that he entered the store, was struck on the back of his head, and did not see anything or anybody.  He awoke on the floor and staggered out of the store to his friend's car.  He was later taken to the hospital with a cracked skull.

Finally, a police department criminalist analyzed the spent .32 caliber bullet casings recovered from *both* crime scenes and was able to positively identify the gun Walker sold to MacIvor as the gun used to shoot the victims at the liquor store and to shoot Rose Olveda.  The criminalist also corroborated MacIvor's assertion that there was no evidence that the gun had been buried or oiled down.  Walker had told MacIvor that a friend in prison at Soledad had killed someone with the firearm eight months earlier, but the prosecution established at trial that there was no homicide involving a .32 caliber gun in Monterey County between October 1978 and May 1979.

The defense argued mistaken identity, and Walker testified on his own behalf.  He testified that he could not

recall where he was on the days in question, but that he did not commit the charged crimes.  However, he did admit to selling the gun to Officer MacIvor, but claimed he had himself bought it from two men in a blue van.  The defense attempted to impeach the eyewitness identifications, using his previous statements to MacIvor and the police.

At the outset of the trial, Superior Court Judge John Shatz stated that he has never found the need to shackle any defendant and asked Walker if there was any reason to have him shackled.  Walker answered "No," and the trial proceeded.  The Sheriff's office nevertheless placed a knee restraint on Walker under his clothing for the entirety of the trial, from the first day of voir dire through the completion of capital sentencing.  Walker and the state have stipulated that "[t]he shackle was a heavy plastic leg-locking device secured on either of Mr. Walker's legs, underneath his trousers."  The parties stipulated that Walker would have testified that:

> The shackle was a solid piece of molded plastic, approximately 2 feet long and 1/8" to 1/4" thick, weighing about three pounds.  The shackle was slit open on one side and fit to his leg by pulling the open side apart and placing it around his leg from the back so that the open sides abutted his knee-cap.  The shackle was secured via two large Velcro straps, one above and one below the knee.

It is undisputed that the trial court never made any finding on the record of the necessity of Walker's shackling.  It is also undisputed that the jury was aware of it.

During the prosecution's cross-examination of Walker's girlfriend, Denise Jackson, the prosecutor asked Jackson whether Walker had a limp when she visited with him during August and September 1979.  The witness stated that Walker did not limp as he was now doing at trial: "It wasn't like the brace. The brace is the reason he limps in Court."  In response to the prosecutor's follow-up question, she noted that his limp in court was not due to a medical condition.  Defense counsel objected, and the judge sought to clarify the testimony for the jury's benefit, by posing the following to the witness:

> You're talking about the knee restraint that the Sheriff puts on persons who are in custody? Is that what you're referring to?

Jackson answered in the affirmative, and the cross-examination continued.  It is undisputed that Walker's counsel never objected to his client's shackling or the failures of the trial court to hold a hearing on the subject, make any determination of its necessity on the record, or give curative instructions to the jury or otherwise minimize the effect of the shackling, beyond his question to Denise Jackson.

The trial spanned 11 days of a two-and-a-half week period, not counting voir dire, before it went to the jury.  The jury deliberated for about 35 hours over the course of five days before returning a verdict.  At the end of the first day of deliberations, the jury indicated that it was looking at only one count.  In the afternoon on the second day, the jury asked the court to re-read Romero's testimony, the last part of Walker's testimony, and the reasonable doubt instruction.  The jury then expressed confusion regarding the law for degrees of murder, felony murder, and personal use of a firearm.  Those instructions were re-read to the jury.

On the afternoon of the third day of deliberations, the jury asked the court to re-read Romero's testimony from the point he rose after the shooting until he arrived at the neighboring apartment, and to re-read the instructions for assault and use of a firearm. At that time, the foreman informed the court, "[a]s you know, there are several parts to several counts. We have arrived at a decision on some of the parts of some of the counts." The foreman explained that the jury was confused about how specific intent applied to a concurrent murder and robbery. In response, the trial court re-read the concurrence-of-act and specific-intent instructions.

The next morning, the jury informed the judge that it had decided Counts One through Five (the charges arising out of the first incident), but not Counts Six through Eight (the charges arising out of the second incident). The jury asked the court to re-read Olveda's testimony. The next afternoon, the jury reached its verdicts on all of the charges.

As to the first incident, the jury found Walker guilty of first-degree murder for the murder of 15-year-old Vasquez, in addition to two counts of assault with intent to commit murder for Zamora and Romero, and the robbery of Romero. The jury found that Walker personally used a firearm in the commission of each offense. The jury also found one death penalty special circumstance: the murder was committed while Walker was engaged in the commission or attempted commission of a robbery. The jury acquitted Walker of the assault with intent to murder Enrique Guerrero, the customer who had entered the store during the robbery and been struck over the head with a bottle. As to the second incident involving Rose Olveda, Walker was found guilty of assault with intent to murder, robbery, and personal use of a firearm

in the commission of those offenses, as well as the theft of Olveda's vehicle.

### 2. Penalty Phase

The prosecution and defense stipulated that the evidence from the guilt phase could be considered by the jury in the penalty phase as well. Only a few additional witnesses testified.

The state's witnesses testified to two violent threats Walker had made. An Officer Nichols, a witness for the state, testified that he intercepted a conversation between Walker and his cousin Lawrence Martin on September 26, 1979, while they were in police custody detained on suspicion of committing a burglary. Walker was heard telling Martin that he would have to get the gun from MacIvor and that MacIvor would have to be killed. Officer MacIvor testified that, after the preliminary hearing on October 30, 1979, Walker walked by him and a deputy district attorney, and stated, "The hell with getting a cop. I'll get me a D.A."

Several family members and friends testified on Walker's behalf. Walker's mother stated that Walker, then 21 years old, had grown up in a poor family with seven brothers and sisters. She testified that Walker worked and helped to support the family. His sisters testified that Walker had helped them financially and emotionally in the past. They all asked that he be spared the death penalty. Additionally, a church secretary testified that Walker had done some yard work for her in the past. One of Walker's friends testified that he sometimes drove her to work. Defendant's girlfriend testified that he had assisted her emotionally and that she loved him and did not want him to die. Walker testified again

and denied threatening the officer or the deputy D.A. He maintained his innocence.

The jury deliberated for approximately ten hours over a period of three days and ultimately determined that Walker should receive the death penalty for Count One, the murder of 15-year-old Vasquez.

## II. State Litigation

On direct appeal, the California Supreme Court affirmed Walker's convictions and sentence. As for the matter of the knee brace, the court held that the issue had been waived because Walker's counsel had not objected below. *Walker*, 765 P.2d at 83.

Walker subsequently filed his first habeas petition in state court. On September 30, 1992, the California Supreme Court denied his ineffective assistance of counsel claims "on the merits," but without explanation. Citing its 1989 opinion, it reaffirmed that the shackling claim had been waived for failure to object at trial. The court noted further that all of the facts underlying the shackling and ineffective assistance of counsel claims were known or readily available to Walker and his counsel at the time of the direct appeal. The Supreme Court denied his petition for a writ of certiorari in March 1993. *Walker v. California*, 507 U.S. 979 (1993).

Walker filed his second state habeas petition on June 5, 1998. On December 22, 2004, the California Supreme Court denied this petition "on the merits for failure to state a prima facie case for relief" and "as untimely." It did not provide any further explanation.

### III.    Federal Habeas Litigation

Walker had first filed a federal habeas petition on May 20, 1997, but it was deemed unexhausted. *Walker*, 803 F. Supp. 2d at 1039. Following the California Supreme Court's denial of his second state habeas petition in 2004, Walker filed a Second Amended Petition for Writ of Habeas Corpus in federal court.

Claims 2(c) and 9 are before us on appeal. Claim 2(c) is the ineffective assistance of counsel claim based on trial counsel's failure to object to Walker's shackling, during either the guilt or penalty phase. Claim 9 is the stand-alone shackling claim. The district court reserved judgment on several other claims pending possible reversal of its decision on claims 2(c) and 9 and entered a Federal Rule of Civil Procedure 54(b) judgment granting the writ as to those claims.

In order to avoid the necessity of an evidentiary hearing on the shackling and ineffective assistance of counsel claims, the state and Walker submitted a "stipulated set of facts and evidence, including a stipulation as to witness testimony."

The district court first held that the California Supreme Court was objectively unreasonable in concluding that Walker's trial counsel's performance was not constitutionally deficient when he failed to object to the brace. *Walker*, 803 F. Supp. 2d at 1046. Noting that the law regarding shackling was "well-established" at the time of Walker's trial in 1980, the court held that the record compelled the finding that counsel's failure to object could not have been driven by "any reasoned, strategic, or tactical decision." *Id.* And citing *Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008),

which in turn relied on the Supreme Court's decision in *Deck v. Missouri*, 544 U.S. 622, 634–35 (2005), the court noted that, in the absence of record findings on the necessity for shackling the defendant, "post-hoc rationalizations" will not cure a due process violation. *Walker*, 803 F. Supp. 2d at 1048. The district court further noted that the only pertinent on-the-record finding showed the trial judge concluding that no restraint was necessary. *Id*. at 1047–48 (citing Stip. Fact ¶ 2). In light of the court's failure to make proper findings to support the use of the knee restraint, the court could find no justification in the record for trial counsel's failure to object, failure to request a hearing on the issue, and failure to request any corrective instructions for the jury. *Id*.

The district court then moved to the second prong of the *Strickland* test and concluded that the California Supreme Court was objectively unreasonable in concluding that trial counsel's deficient performance did not prejudice the outcome of the guilt and penalty phases of Walker's trial. *Id*. at 1049. As to the guilt phase, the court evaluated the record against the four factors for determining whether shackling unconstitutionally prejudices a defendant. *Dyas v. Poole*, 317 F.3d 934, 937–38 (9th Cir. 2003) (per curiam).[3] It concluded that a violent crime was at issue in the case; the evidence, particularly the eyewitness testimony, was not overwhelming; and the length of the jury's deliberations – approximately 35-five hours over five days – suggested that it was a close case. *Walker*, 803 F. Supp. 2d at 1050–51.

---

[3] The district court erred in applying our *Dyas* multi-factor test as if it were binding, clearly established law applicable in an AEDPA case under 28 U.S.C. § 2254(d). It is not. In AEDPA cases, we apply the Supreme Court's test, not our own. *See Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam).

Accordingly, the district court granted habeas relief as to the guilt phase. *Id.*

The district court applied the *Dyas* factors to the penalty phase as well and granted Walker habeas relief. *Id.* at 1052–53. The court found that Walker's "violent nature and propensity for future violence" were directly at issue in the jury's consideration of aggravating evidence the prosecution presented, namely Walker's alleged threats against the deputy district attorney and Officer MacIvor. *Id.* at 1052. Additionally, one juror assumed that Walker was wearing the restraint because he had threatened a deputy district attorney. *Id.* at 1053. The court also found that the length of the jury's deliberations (ten hours over three days) suggested that the jury did not believe the case was "clear-cut" and that the mitigating evidence introduced by the defense made the case a "close call." *Id.*

As to Claim 9, the stand-alone shackling claim, the district court ruled that there were cause and prejudice to review this procedurally defaulted claim on the merits, even though Walker's counsel did not object at trial and failed to raise the issue on direct appeal until the 1989 rehearing. *See Sawyer v. Whitley*, 505 U.S. 333, 338 (1992) ("Unless a habeas petitioner shows cause and prejudice, a court may not reach the merits of . . . *procedurally defaulted claims* in which the petitioner failed to follow applicable state procedural rules raising the claims." (citations omitted)); *Walker*, 765 P.2d at 83. Constitutionally ineffective assistance of counsel plus actual prejudice will satisfy this test and allow habeas review of a procedurally defaulted claim. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). The district court reiterated its holding that, even under AEDPA's standard, the California Supreme Court had unreasonably

applied *Strickland*. *Walker*, 803 F. Supp. 2d at 1054–55. Therefore, the court could reach the merits of the shackling claim. *Id.* at 1055. On the merits, the district court found that the physical restraints had been seen by the jury; that the record contained no justification or judicial finding based on state interests; and Walker suffered prejudice as a consequence. *Id.* at 1055 (citing *Deck*, 544 U.S. at 629–32; *Cox v. Ayers*, 613 F.3d 883, 890 (9th Cir. 2010)). Accordingly, the district court granted Walker habeas relief on the stand-alone shackling claim as well. *Id.*

The warden appealed the district court's decision, arguing that the California Supreme Court reasonably decided there was no *Strickland* prejudice as to either the guilt or penalty phase.

## IV. Jurisdiction

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's grant or denial of a petition for writ of habeas corpus *de novo*. *Fernandez v. Roe*, 286 F.3d 1073, 1076 (9th Cir. 2002).

## V. Analysis

### A. Applicable Legal Standards

The Supreme Court made clear in *Harrington*, 131 S. Ct. at 785–86, that a state court need not provide its rationale before its decision can be deemed an adjudication on the merits. "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, *could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id*. at 786 (emphasis added). It remains the petitioner's burden to demonstrate that "there was no reasonable basis for the state court to deny relief." *Id*. at 784. Therefore, "when the state court does not supply reasoning for its decision," we are instructed to engage in an "independent review of the record" and ascertain whether the state court's decision was "objectively unreasonable." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). Crucially, this is not a *de novo* review of the constitutional question. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Rather, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786.

Under 28 U.S.C. § 2254(d)(1), a state court's decision is "contrary to . . . clearly established Federal law," as determined by the U.S. Supreme Court, "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's decision "involve[s] an unreasonable application of[] clearly established Federal law" as determined by the U.S. Supreme Court, within the meaning of § 2254(d)(1), "if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). The Supreme Court has underscored that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410.

WALKER V. MARTEL                    25

Accordingly, we may not grant habeas relief if "fairminded jurists could disagree over whether" the state court's decision was correct. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).[4]

The Supreme Court's decision in *Premo v. Moore*, 131 S. Ct. 733, 743–46 (2011), makes clear that the California Supreme Court's denial of habeas relief must be evaluated against U.S. Supreme Court precedent on ineffective assistance of counsel claims, principally *Strickland* and its (Supreme Court) progeny. In *Premo*, the Ninth Circuit had granted habeas relief, because it found the state court's decision was "contrary to" *Arizona v. Fulminante*, 499 U.S. 279 (1991), under AEDPA. *Premo*, 131 S. Ct. at 743–46. The Supreme Court reversed, holding that the state court's determination that the petitioner failed *Strickland* could not have been "contrary to" *Fulminante*, because the latter case "involved the admission of an involuntary confession in violation of the Fifth Amendment" and said "nothing about the *Strickland* standard of effectiveness." *Id.* Here, too, the due process shackling cases cited by Walker simply did not confront ineffective assistance of counsel claims. The lesson of *Premo* is that *Strickland* bears its own distinct substantive

---

[4] Typically, even if the requirements of 28 U.S.C. § 2254(d) are satisfied, habeas relief nevertheless requires a further showing of "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). However, because the relevant "clearly established law" in this case, the *Strickland* test for ineffective assistance of counsel claims, already includes its own prejudice prong, the *Brecht* inquiry would be duplicative. *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

standard for a constitutional violation; it does not merely borrow or incorporate other tests for constitutional error and prejudice. *Premo*, 131 S. Ct. at 743.

As previously noted, the first claim at issue on appeal (Claim 2(c)) is an ineffective assistance of counsel claim for failure to object to Walker's shackling, *not* a due process claim based on the shackling itself.[5]   Therefore, the applicable, clearly established Supreme Court law is the *Strickland* line of precedent, not the shackling due process cases. *Pinholster*, 131 S. Ct. at 1403. This means that, in order to grant habeas relief, a federal court must find that the state court acted contrary to *Strickland* or was unreasonable in concluding that Walker suffered *Strickland* prejudice, i.e. a reasonable likelihood that the result would have been different—at the guilt and/or penalty phase—but for the constitutionally deficient performance by counsel.

"To establish ineffective assistance of counsel 'a defendant must show both deficient performance [by counsel] and prejudice.'" *Premo*, 131 S. Ct. at 739 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Supreme Court has explained the *Strickland* inquiry as follows:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [*Strickland*,] 466 U.S. at 688. A court

---

[5] Claim 9 is the procedurally defaulted due process shackling claim. The district court reached the merits of this claim upon finding the California Supreme Court had unreasonably applied *Strickland* and, therefore, "cause and prejudice" excused the procedural default.

>considering a claim of ineffective assistance
>must apply a "strong presumption" that
>counsel's representation was within the "wide
>range" of reasonable professional assistance.
>*Id*., at 689. The challenger's burden is to show
>"that counsel made errors so serious that
>counsel was not functioning as the 'counsel'
>guaranteed the defendant by the Sixth
>Amendment." *Id*., at 687.
>
>With respect to prejudice, a challenger
>must demonstrate "a reasonable probability
>that, but for counsel's unprofessional errors,
>the result of the proceeding would have been
>different.   A reasonable probability is a
>probability sufficient to undermine confidence
>in the outcome." *Id*., at 694.

*Richter*, 131 S. Ct. at 787.  "The benchmark for judging any
claim of ineffectiveness must be whether counsel's conduct
so undermined the proper functioning of the adversarial
process that the trial cannot be relied on as having produced
a just result." *Strickland*, 466 U.S. at 686.  The likelihood of
a different outcome must be "substantial," not merely
"conceivable," *Richter*, 131 S. Ct. at 792, and when
*Strickland* and AEDPA operate "in tandem," as here, the
review must be "doubly" deferential, *id*. at 788; *Knowles*,
556 U.S. at 123.  The review is, again, not de novo: "When
§ 2254(d) applies, the question is not whether counsel's
actions were reasonable. The question is whether there is any
reasonable argument that counsel satisfied *Strickland*'s
deferential standard." *Richter*, 131 S. Ct. at 788.

The due process shackling cases cannot resolve this issue. First and foremost, as noted, we are bound to apply *Strickland* prejudice analysis, not the prejudice standard from clearly established shackling cases at the time of the California Supreme Court's 2004 decision on Walker's second state habeas petition. Second, *Deck v. Missouri*, 544 U.S. 622 (2005), would not permit a finding of presumed prejudice in this case. *Deck* held that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Id*. at 635. However, *Deck* was not decided until 2005, *after* the California Supreme Court's 2004 decision summarily denying Walker's second state habeas petition. Thus, *Deck* could not be clearly established law for this case. It was also a direct appeal, so the Supreme Court did not analyze the case under AEDPA. Moreover, we are of course not analyzing this claim under a due process framework, but rather against ineffective assistance of counsel precedents and the test for prejudice outlined in *Strickland*. *Strickland* requires an actual finding that it is reasonably probable that, but for the unprofessional errors, the outcome at trial would have been different. Even if *Deck* had been clearly established Supreme Court precedent in 2004, its presumed-prejudice holding would not have controlled our determination on Walker's ineffective assistance of counsel claim. There are only three types of cases in which *Strickland* prejudice is presumed, and this case does not fall within any of those categories. *See Smith v. Robbins*, 528 U.S. 259, 287 (2000) (listing the three categories of presumed-prejudice *Strickland* cases as those involving (1) a denial of counsel, (2) state interference with counsel's assistance, and/or (3) an actual conflict of interest).

### B. Application of AEDPA and *Strickland* to Trial's Guilt Phase

Contrary to Walker's contentions, our task is to decide whether the California Supreme Court unreasonably applied the *Strickland* standard.   Because counsel's deficient performance is not raised by Warden Martel on appeal, deficient performance is a given and we focus solely on the *Strickland* prejudice prong, i.e. whether it was reasonable for the California Supreme Court to conclude that, even if Walker's trial counsel had objected to and secured the removal of the shackle, a different outcome was not reasonably probable:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.   Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different.

*Richter*, 131 S. Ct. 791–92 (citations omitted).   Crucially, "the *Strickland* standard is a general one, so the range of reasonable applications is substantial."   *Id*. at 788.   For the following reasons, we conclude that the California Supreme Court reasonably decided that Walker was not prejudiced under *Strickland*.

First, while our review is confined to the separate and distinct prejudice inquiry from *Strickland*, in order to assess what effect counsel's failure had, we necessarily must evaluate the restraint itself and what role, if any, it may have

played in driving the jury's verdict.  Not all restraints are created equal.  The molded-plastic brace placed on Walker's leg underneath his clothing was not a ball and chain, handcuffs secured to a belly chain, a gag, or the like. Although the jury became aware of the restraint, it was relatively unobtrusive.  The jury really noticed the restraint only when it restricted Walker's movement to and from the witness stand near the end of the defense's case. Additionally, it only suggested Walker's custody status, not a proclivity for violence, as his hands were unencumbered. We have held that "the greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice." *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989).  Thus, "physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint." *Larson*, 515 F.3d at 1064.  We may look to the due process shackling cases as illustrative of the degree of prejudice assigned to different restraints.  The knee restraint in this case was significantly less obtrusive and restrictive than the kinds of shackles that the Supreme Court has considered. *See Deck*, 544 U.S. at 625 (leg irons, handcuffs, and a belly chain); *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986) (shackled and gagged); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (bound and gagged).[6]

---

[6] It was also less draconian than the shackles considered by our court in prior cases. *Cox v. Ayers*, 613 F.3d 883, 890–92 (9th Cir. 2010) (handcuffed to the chair and later handcuffed to the chair and wearing leg restraints); *Larson*, 515 F.3d at 1062 (wearing a leg brace over clothing for the first two days of a six-day trial); *Comer v. Schriro*, 463 F.3d 934, 963–65 (9th Cir. 2006) (slumped in a wheelchair, bleeding, nearly naked, shackled and with his hands bound); *Dyas v. Poole*, 317 F.3d 934, 936–37 (9th Cir. 2003) (per curiam) (wearing leg shackles in court and brought into and out of the courtroom in shackles); *Rhoden v. Rowland*, 172 F.3d 633, 635 (9th Cir. 1999) (wearing leg chains); *Duckett v. Godinez*, 67 F.3d

Second, during Ms. Jackson's testimony, the trial judge effectively communicated that this was a more-or-less routine custody measure employed by the Sheriff's office. A reasonable juror would have taken from his comments that the knee restraint's purpose was to facilitate custody, not to combat any perceived dangerousness of the defendant. The judge's comments went a long way to dispelling any impression that Walker posed a unique threat in court. In addition, the jury knew that Walker was in custody. In fact, Walker himself twice told the jury during his testimony that he was currently in jail. The California Supreme Court could have considered these facts and reasonably determined that, even if counsel had objected to the restraint, a different verdict would not have been reasonably likely.

Third, the evidence upon which Walker was convicted was robust. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. In this case, two of the three survivors, Romero and Olveda, gave testimony and independently identified Walker as the robber, assailant, and murderer. These eyewitness identifications were powerfully corroborated by Walker's sale of the gun used in both incidents to Officer MacIvor just three weeks after the second robbery. As relayed to the jury, Walker told MacIvor that the gun had been in his possession for months, had made him a

---

734, 746 (9th Cir. 1995) (wearing prison clothes, handcuffs, and a security chain); *Morgan v. Bunnell*, 24 F.3d 49, 51–52 (9th Cir. 1994) (per curiam) (wearing leg irons); *Spain*, 883 F.2d at 719, 722 (wearing 25 pounds of chains 10–12 hours a day for almost five years, including leg irons, a waist chain that bound each hand, a chain attached to the chair and possibly a neck chain); *Stewart v. Corbin*, 850 F.2d 492, 495–96 (9th Cir. 1988) (shackled, gagged, and handcuffed to a chair).

lot of money in recent months, and "had done a murder." Another witness, who lived in an apartment near Dan's Bottle Shop, testified to witnessing the get-away vehicle for the first robbery and described a car very similar to Walker's car. Additionally, Olveda's car was found near Walker's sister's residence, where he had been living in late 1979. Finally, Walker had been caught bragging about killing someone during a robbery. In the face of such overwhelming evidence of Walker's guilt, it is not reasonably probable that Walker would have obtained a different verdict had he not been forced to wear the restraint.

The district court relied heavily on the length of the jury's deliberations, but the 35 hours they spent considering the testimony of 26 witnesses spanning two-and-a-half weeks demonstrates only that the jury carefully considered each of the charges. The jury was tasked with considering eight separate criminal charges involving multiple victims of two robberies, different degrees of homicide, "special circumstance" allegations for multiple charges, voluminous testimony, jury instructions it found confusing, and complicated verdict forms. The jury went through each element of each charge, taking defense counsel's advice. As it considered each charge, the jury asked the court to re-read the instructions and testimony relevant to the charge. The California Supreme Court reasonably could have inferred that this conduct was consistent with diligence and care, not an unambiguous sign that it was a close case.

Fourth, the jury acquitted Walker of assault with intent to murder Guerrero. This telling fact unmistakably demonstrates that the jury was able to analyze the evidence fairly and was not blinded by the brace on Walker's leg.

The California Supreme Court reasonably concluded that, even if Walker's counsel had objected to the restraint and even if the shackle had been removed for trial, it is not reasonably likely that the outcome would have been different.

## C. Application of AEDPA and *Strickland* to Trial's Penalty Phase

The district court also erred in granting habeas relief as to the penalty phase, seemingly applying a *de novo* review of the *Strickland* prejudice analysis and then asserting that the California Supreme Court reached a patently unreasonable conclusion. *See Richter*, 131 S. Ct. at 786 (disapproving the Ninth Circuit's "*de novo* review" of *Strickland* inquiry and then "declar[ing], without further explanation, that the 'state court's decision to the contrary constituted an unreasonable application of *Strickland*'" (citation omitted)). The question, properly framed, has two layers, but they form a single inquiry: whether the California Supreme Court was (1) *reasonable* in concluding that (2) it is *not reasonably probable* that Walker would have avoided the death penalty had his counsel objected to the shackle. *Strickland*, 466 U.S. at 695; *Woodford v. Visciotti*, 537 U.S. 19, 22–23 (2002) (per curiam).

Walker was convicted of unspeakably cruel acts, including a murder and assault with intent to murder, all in the course of two robberies. And, as previously discussed, the evidence upon which he was convicted was strong. In the first robbery, Walker executed a young man and attempted to kill two other individuals, who were left permanently injured, for $150 in cash and a wallet. In the second robbery, Walker brutally beat and then shot a young woman, permanently injuring her–he walked away with $11 and her car keys. The

record establishes that Walker's motive was to leave no witnesses.  The jury also heard that Walker threatened the life of a deputy district attorney at a preliminary hearing.  By way of mitigation, the jury heard that Walker was only 19 years old at the time of the crimes, had no prior criminal record, had done some yard work for a church secretary, and was loved by his mother, sisters, and girlfriend, to whom he provided financial and emotional support.

The California Supreme Court reasonably could have concluded that the jury's knowledge of the knee restraint was trivial in relation to the magnitude of his crimes, given the caliber of the mitigation.  It is hard to imagine that the additional quantum of information gained by noticing a custodial leg restraint worn under Walker's clothing would have so altered the jury's perception of the evidence that it would have changed the outcome.[7]  The California Supreme Court was not unreasonable in deciding that it was not reasonably probable that the jury would have balanced the

---

[7] This case is quite different from *Roche v. Davis*, 291 F.3d 473 (7th Cir. 2002). Unlike Walker's restraints, Roche's restraints were more extensive and actually visible above his clothes.  Both of his legs were shackled in leg cuffs or irons, and no precautions were taken to prevent the jury from seeing the restraints.  Although Roche was shackled, his co-defendant comparatively at their joint trial was not, obviously suggesting to the jury that Roche was dangerous.  *Id*. at 480.  Also, unlike in our case, the trial judge said nothing to the jury to minimize the prejudicial impact.

The Seventh Circuit explained that the issue in *Roche* was whether counsel was ineffective for failing to object to the shackling *in addition to* failing to ensure that the jury could not see the shackles.  *Id*. at 483.  In our case, Walker's defense counsel arranged for the jury to take its breaks and remain downstairs in the courthouse to prevent the jury from seeing Walker visibly handcuffed or restrained while he was being transported or taken into or out of the courtroom.

aggravating and mitigating evidence differently and reached a different sentence, but for the leg brace.

### D.  Claim 9

Because the California Supreme Court reasonably could conclude that Walker failed to establish *Strickland* prejudice, there was no cause and prejudice to reach the due process shackling claim contained in Claim 9.  *See Sawyer*, 505 U.S. at 338.

### VI.    Conclusion

The California Supreme Court necessarily decided that it was not reasonably probable that either Walker's conviction or sentence would have turned out differently had counsel objected to the brace Walker wore beneath his clothing during the trial.  Given what "prejudice" means in the ineffective assistance of counsel context, the strength of the evidence, the nature of the brace, the atrociousness of Walker's crimes, and the quality of the mitigation, we cannot say that the state court's decision was contrary to or an unreasonable application of United States Supreme Court law.

### REVERSED AND REMANDED.

GOULD, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's holding that the state court reasonably concluded that a jury would not have acquitted Walker if counsel for Walker had with success objected to the shackle. We presume that juries follow instructions that are given, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and here, even if the evidence had been presented without Walker shackled, I cannot see any likelihood that a responsible jury would have acquitted Walker. The evidence of his role in perpetrating armed robberies, with a philosophy to leave no witnesses, a murder, several attempted murders, and a serious sexual and physical assault on a young woman was just too strong to think that he was convicted because he was shackled.

But I depart from the majority's holding that the California Supreme Court reasonably decided that counsel's deficiency did not prejudice Walker in the penalty phase. The reason here too rests on the premise that juries follow the instructions given them. *See id.* In the penalty phase, the jury was instructed that it could implement the mercy of life imprisonment rather than death based on mitigating evidence. Walker's murder and his assaults were cruel and atrocious, but he had going for him in mitigation that he was only a teenager when the crimes were committed, had a clean record before then, and was good to his mother and sister. There is no way to know how a jury would have weighed such factors once told it had the power to permit or to preclude a death sentence, absent shackling that weighed on the jurors' sensibilities. Stated another way, if counsel had competently fulfilled his duty to have his client unshackled when under the gaze of the jury, I have grave doubt about whether Walker

still would have been sentenced to death.  Because the jury's role is relatively unconstrained in deciding whether to opt for mercy and life rather than the most extreme punishment of death, we cannot say that the shackling error of counsel did not cause prejudice to Walker.

The Supreme Court treats death differently by requiring courts to take a closer look at capital cases even where deference is generally given to trial-court decisions.  Since reinstating the death penalty in *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court has required the administration of capital cases to comply with due-process requirements and with many special rules, *see, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982) (requiring a sentencer to consider and give some weight to every piece of mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (requiring courts to introduce any mitigating evidence that a defendant wants in the penalty phase); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (finding a statute imposing a mandatory death sentence for certain crimes unconstitutional and stating that courts must be very cautious in performing proportionality review in capital cases because "[d]eath, in its finality differs more from life imprisonment than a 100-year prison term differs from one of only a year or two"); *Gregg*, 428 U.S. at 191–95 (holding that a sentencer must weigh aggravating factors against mitigating factors to ensure proportionality between the crime and the punishment).

The Court has also carved out groups of defendants who cannot constitutionally receive the death penalty.  *See Roper v. Simmons*, 543 U.S. 551, 574 (2005) (juveniles); *Atkins v. Virginia*, 536 U.S. 304, 320 (2002) (mentally deficient); *Tison v. Arizona*, 481 U.S. 137, 158 (1987) (nontriggermen

involved in felonies resulting in murder absent intent to kill or reckless indifference); *Enmund v. Florida*, 458 U.S. 782, 801 (1982) (same); *Coker v. Georgia*, 433 U.S. 584, 598–99 (1977) (rapists who do not kill anyone). These rules reinforce that "death is different" and reflect the Supreme Court's aim to ensure that death is not dolled out to the undeserving. *See Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation . . . . And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity."); *see also* Nancy J. King & Joseph L. Hoffmann, *Habeas for the Twenty-First Century* 127 (2011).

These death-penalty-specific rules are exceptions to the Supreme Court's general principle that we take a deferential approach when evaluating a sentence imposed by a state court. *See, e.g.*, *Ewing v. California*, 538 U.S. 11, 17–18, 29–30 (2003) (noting that a high degree of deference must be given to the policy judgments of the state in performing proportionality review and upholding the imposition of a potential life sentence for stealing three golf clubs under California's three strikes law); *Harmelin v. Michigan*, 501 U.S. 957, 995–96 (1991) (upholding a statute that imposed a mandatory life sentence without parole for simple possession of more than 650 grams of cocaine); *Hutto v. Davis*, 454 U.S. 370, 370–71, 374 & n.3 (1982) (per curiam) (upholding a forty-year prison sentence for possession with intent to distribute nine ounces of marijuana); *Rummel v. Estelle*, 445 U.S. 263, 266, 285 (1980) (refusing to strike down a mandatory sentence of life imprisonment under the Texas recidivist statute for obtaining $120.75 by false pretenses).

A defendant demonstrates a claim of constitutionally ineffective assistance of counsel when: (1) counsel's efforts in defense are "outside the wide range of professionally competent assistance[;]" and (2) the defendant thereby suffers prejudice. *Strickland v. Washington*, 466 U.S. 668, 690–94 (1984). Warden Martel did not appeal the district court's finding that the state court unreasonably determined that Walker's attorney performed satisfactorily. *See Walker v. Martel*, 803 F. Supp. 2d 1032, 1046–1049 (N.D. Cal. 2011) ("Given the clearly established federal law and the undisputed facts in this case, this court must conclude that the state court's summary decision that there was no deficient performance is objectively unreasonable."). This is understandable. The state trial court made no findings on need for shackling, which were beyond doubt required by federal law. Notwithstanding the absence of any findings justifying shackling, Walker's lawyer did not object to the shackling, though any competent lawyer paying attention to it would have done so. We therefore accept that the attorney's performance was deficient, leaving us to consider whether the state court was unreasonable in determining that counsel's unprofessional performance did not prejudice Walker. Prejudice is established when a challenger demonstrates that there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo v. Moore*, 131 S. Ct. 733, 739 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1482 (2010)); *see also Strickland*, 466 U.S. at 694. This issue poses the crux of this appeal.

An assumption of prejudice does not automatically spring from counsel's deficiency because failure to object to shackling does not fall within the three categories on which

prejudice is presumed.  *Smith v. Robbins*, 528 U.S. 259, 287 (2000) (stating that a denial of counsel, state interference with counsel's assistance, and an actual conflict of interest are the only errors that lead to presumed prejudice in the ineffective assistance of counsel context).  But because prejudice is not presumed does not mean that it is absent.  The majority cites to *Premo v. Moore* to support its decision to dismiss the Court's holding in *Deck v. Missouri*, 544 U.S. 622, 635 (2005) (holding that "where a court, without adequate justification orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice").  But *Moore* involved a challenge to a conviction and not a death sentence.  131 S. Ct. at 737–39.  And *Moore* only held that the cases in which due-process claims are directly raised, as opposed to cases in which due-process problems are challenged through the lens of ineffective assistance of counsel, cannot establish per se rules of prejudice in the *Strickland* context.  *Id.* at 744–45.  Nowhere did *Moore* suggest that *Deck* and cases like it should be rendered irrelevant.  Due-process cases discussing the degree of prejudice resulting from an underlying error that is the consequence of an attorney's deficiency are persuasive because they help us assess an error's significance.  *See Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 453–55 (2009) (per curiam) (granting habeas relief from a death sentence on AEDPA review of a *Strickland* ineffective assistance of counsel claim based on counsel's failure to introduce mitigating evidence and citing several non-*Strickland* cases in support of a prejudice finding).

Deck and the other shackling cases suggest that error resulting in a defendant's visible restraint is serious when shackling is known to the jury.  *Deck*, 544 U.S. at 633 ("The appearance of the offender during the penalty phase in

shackles . . . almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community—often a statutory aggravator and nearly always a relevant factor in jury decisionmaking . . . . It also almost inevitably affects adversely the jury's perception of the character of the defendant."); *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) ("Whenever a courtroom arrangement is challenged as inherently prejudicial . . . the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play." (internal quotation marks omitted)); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) ("[N]o person should be tried while shackled and gagged except as a last resort."); *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) ("[P]hysical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint."); *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989) ("[T]he greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice."). We can conclude from these cases that although obtrusive shackling intensifies the degree of prejudice, even minor shackling may result in prejudice. *See Roche v. Davis*, 291 F.3d 473, 482–83 (7th Cir. 2002) (noting that "the sight of a defendant in shackles 'could instill in the jury a belief that the defendant is a dangerous individual who cannot be controlled, an idea that could be devastating to his defense.'" (quoting *Harrell v. Israel*, 627 F.2d 632, 637 (7th Cir. 1982))).

In deciding that the state court was reasonable in finding that Walker was not prejudiced in either the guilt or penalty phase, the majority relies on three primary points: that the shackle itself was unobtrusive and nonprejudicial; that the

trial judge dispelled the impression that Walker was a threat; and that the evidence against Walker was strong. I agree with the third point and conclude that it justifies the California Supreme Court's finding as to Walker's guilt. But I part company with the majority as to the penalty phase, concluding that the majority minimizes the prejudicial effect of the shackle and maximizes the ameliorative power of the judge's instructions, and tolerates shackling absent justifications in a penalty-phase context where shackling is inherently unfair to a defendant's legitimate prospect that a jury will show mercy and favor life over death.

The jury in this case was considering the fate of young adult who was only a teenager when he committed the crimes; a teenager with no prior criminal record, who grew up poor and gave financial and emotional support to his mother and sisters. *People v. Walker*, 765 P.2d 70, 87–88 (Cal. 1988). The jury was contemplating whether to extinguish the life of a young man who was loved by his family, whatever the horror of the crimes he committed against others. *Id.* I have grave doubt whether the shackle diminished these mitigating facts and intensified aggravating factors such as the dangerousness of Walker.

Jurors were aware of the shackle when Walker approached the witness stand to testify as it prevented Walker from walking "normally." Despite being underneath Walker's pant leg, some jurors also saw the leg brace (or other forms of restraints that Walker periodically wore, such as handcuffs and a waist chain) apart from when Walker approached the witness stand. One juror testified that she assumed Walker's movement was confined "because of what he was being held for" and said that "the shackles seemed like a short lead on a vicious dog." The prosecutor drew

attention to the shackle in re-cross examination of Walker's girlfriend during the guilt phase. On one occasion, the bailiff "jump[ed] up behind [Walker] and subsequently handcuff[ed] him within view of the jury" after Walker adjusted the brace. The jury "looked scared as a result." Because of these facts I do not share the majority's opinion that the shackle was not obtrusive and prejudicial.

Although the majority states that "the judge indicated to the jury that the brace was a more-or-less routine measure taken by the sheriff for all persons in custody," I do not give much weight to the statement's ameliorative effect. We presume that jurors carefully follow instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985); *see also Weeks*, 528 U.S. at 234. But the judge's explanation about the shackle was not phrased as an instruction to guide the jury, and should not be viewed by us as an instruction to be followed.

The judge did not specifically tell the jury how to perceive the shackle. Instead, the judge merely interrupted the testimony of Ms. Jackson, who had brought up the brace while being questioned by the prosecutor. The judge then asked, "You're talking about the knee restraint that the Sheriff puts on persons who are in custody? Is that what you are referring to?" This passing statement is not the same as explicit instructions given in cases where courts have found that a judge's statements cured the general prejudice of shackles. *See Woods v. Thieret*, 5 F.3d 244, 249 (7th Cir. 1993) (where the judge "went even further [than removing the jury while inmates were escorted wearing shackles to the witness stand] and gave a curative instruction advising the jury to disregard the restraints when assessing the testimony"); *Holloway v. Alexander*, 957 F.2d 529, 530 (8th

Cir. 1992) (where the judge "admonished the jury to disregard the shackles in their consideration of [defendant's] case"). Reasonable jurors would not have considered the judge's remark a directive, so we cannot presume that it had a curative effect. The comment by the judge also does not suggest that *all* persons in custody, both violent and nonviolent, wear the shackle.

We cannot be absolutely certain how the presentation of an unshackled Walker would have affected the possibility that a jury would have shown mercy. But certainty is not required. Prejudice is shown where there is a reasonable probability that the outcome would have been different. *Strickland*, 466 U.S. at 694. Where, as here, a unanimous sentence is required, there need only be a reasonable probability that "at least one juror could reasonably have determined that . . . death was not an appropriate sentence." *Neal v. Puckett*, 239 F.3d 683, 691–92 (5th Cir. 2001) (footnote omitted); *see also* Cal. Penal Code § 190.4(b) (imposing the death penalty must be a unanimous decision by the jury).

The majority correctly states that Walker bears the burden of proving that he was prejudiced by his attorney's error such that "there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 131 S. Ct. 770, 784, 787 (2011). But I do not see how we can reasonably let the death penalty stand against Walker when the question of whether the jury would have extended mercy is so inherently unknowable with certainty. *See Murtishaw v. Woodford*, 255 F.3d 926, 974 (9th Cir. 2001) (noting that "[b]ecause [the court] cannot actually determine whether the jury would have exercised leniency, [it] cannot determine, one way or another, whether the failure to give the jury that option resulted in

'actual prejudice' to [the defendant]" but reversing and remanding a death sentence due to "'grave doubt' about whether the jury would have returned a death sentence"). It is sufficient that we have grave doubts on the propriety of the penalty because it is reasonably probable that the jury might have shown mercy absent shackling.

In considering a similar habeas capital case where a defendant was placed in leg cuffs during both the guilt and penalty phases of trial, the Seventh Circuit in *Roche v. Davis* found that the risk of prejudice from being unjustly shackled is high and granted relief on the offender's death sentence after finding that aggravating circumstances barely outweighed the mitigating circumstances in the penalty phase.[1] 291 F.3d at 484–85. The Seventh Circuit noted that the "extreme inherent prejudice associated with shackling . . . and the considerable mitigating evidence" established a

---

[1] The majority attempts to distinguish this case on the following grounds: (1) that Roche was tried together with a co-defendant who was not shackled giving rise to the presumption that Roche was dangerous whereas Walker was tried alone; (2) that Roche's restraints were "more extensive" than Walker's and were actually visible above Roche's clothes; and (3) that the judge presiding over Roche's case said nothing to minimize the prejudicial impact of the restraints whereas the judge in Walker's case did. But *Roche* is not distinguishable from the present case. While Walker was not tried with a co-defendant, the shackles in *Roche* were not more obtrusive and prejudicial than those here. Although Roche's shackles were above his pant leg and Walker's brace was not, "the sole mention" of the existence of the shackles in *Roche* was when counsel requested that he would like to have Roche seated at the witness chair before the jury came in so that they would not see his leg cuffs. 291 F.3d at 483. In contrast, at Walker's trial, there were several incidents involving the brace that are reflected in the record and are points of concern. The only precaution in this case taken to ensure that Walker's brace was not visible while he sat as counsel's table was placing the bulky device under his pant leg.

"'reasonable probability' that but for his counsel's deficient performance, the result of [Roche's] sentencing hearing would have been different." *Id.* at 484 (citations omitted). The court concluded that the state court's failure to find prejudice was inconsistent with *Strickland. See id.*

We must consider whether the jury would have spared Walker had he not been shackled. In light of the mitigating evidence presented by Walker, I conclude that there is a real probability that absent the shackle's presence, at least one juror would have concluded that Walker should not be put to death for his crimes committed when a teenager.

In Walker's case, the death penalty was not a certainty. In the penalty phase alone it took the jury about 10.5 hours over the course of three days to reach their decision recommending that Walker be given the death. This is relevant to the question of whether to grant relief and longer than the deliberations in several other penalty cases in which habeas relief was granted. *Bean v. Calderon*, 163 F.3d 1073, 1081 (9th Cir. 1998) ("[W]e find it noteworthy that the jury was initially divided over the appropriateness of the death penalty, deadlocking as to both murders before ultimately returning a death verdict . . . ."); *see Murtishaw*, 255 F.3d at 974 (discussing the role of the jury in deciding whether to impose the death penalty and granting relief where the jury deliberated for two days before returning the death sentence); *see also Roche*, 291 F.3d at 484 (noting that after eight hours of deliberating the jury was unable to recommend death).

Shakespeare told us that "[t]he quality of mercy is not strain'd,"[2] Milton instructed us to "temper so [j]ustice with mercy" and advised us that "[m]ercy [must] colleague with justice,"[3] and President Lincoln reminded us that "mercy bears richer fruits than strict justice."[4] This sentiment in the mind of just one juror could have spared Walker the death penalty. The possibility of mercy is not predictable. It cannot be measured with any degree of accuracy. Here, Walker committed the crimes as a teenager, was loved by his girlfriend who felt he was innocent and "did not want him to die," grew up in poverty, and provided emotional support to his family. *See Walker*, 765 P.2d at 87. In the penalty phase of Walker's trial, a church secretary testified that Walker had helped her with yard work and one of Walker's friends testified that Walker drove her to work. *Id.* Under the framework established by the Supreme Court, it would seem that a modern-day Jack the Ripper whose only mitigation was that he was good to his mother could be spared by a jury, indeed a jury can opt for mercy without giving a reason. Given the mitigating evidence presented for Walker, even though it was sparse, and the prejudice that the shackle likely produced, there is a reasonable likelihood the failure of

---

[2] William Shakespeare, *The Merchant of Venice* act 4, sc. 1, l. 184 (H. L. Withers ed., D. C. Heath & Co. 1916).

[3] John Milton, *Paradise Lost* 345, bk. X, ll. 59, 77–78 (Appleton ed. 1851).

[4] Quotation attributed to Abraham Lincoln from a conversation where Lincoln apparently decided to pardon some young men from New Jersey who had deserted the army, were recaptured, and were sentenced to death. Osborn H. Oldroyd, *The Lincoln Memorial: Album-Immortelles* 459 (Gem Publ'g House 1882).

Walker's counsel to object to the shackle forfeited Walker's chance at mercy.

I do not disagree with the majority that the shackling of Walker in court during the penalty phase may have been "trivial" in comparison with his horrific crimes and intention to leave no witnesses to his robberies.  I could also agree that technically speaking the presumptive prejudice rule of *Deck* may not apply both because we deal with *Strickland* prejudice, not shackling due-process prejudice, and because *Deck* was decided after the state appellate decision here in question.  But nonetheless, for the same reasons that animated *Deck*, we should be concerned that shackling almost certainly would not assist Walker in getting a favorable determination at the penalty phase because it reinforced the idea of Walker's dangerousness at a time when the jury was tasked with considering whether to extend mercy to him.  From the 1970s onward the Supreme Court has had an uneasy truce with the death penalty, permitting it to be applied when all the i's are dotted, all the t's are crossed, all formalities followed, and discretion constrained in permissible ways, but also carving out areas where the death penalty cannot be given to certain persons, like the mentally deficient or juveniles.  At the same time the Supreme Court has made clear that the mitigation factors that can be considered are open-ended, and should not be limited by state or federal courts, *Lockett*, 438 U.S. at 604–05, and that only the jury can make the death-qualifying decision, *see Ring v. Arizona*, 536 U.S. 584, 609 (2010).  Although the AEDPA precedents make the result less than clear, given the Supreme Court's approach to the death penalty in past decades I believe that absent harmless error we must enforce a regime requiring strict compliance with law before implementation of a death penalty.  And harmless error cannot be relied upon if there is a reasonable probability

that the error affected the vote of one juror because of jury unanimity requirements.  I would hold that the death-penalty phase of a capital trial, where jurors have an unconstrained right to prevent death and show mercy in light of unbounded mitigation factors, cannot be properly held while a defendant is shackled before the court and jury without adequate findings and justification for the shackling.  To permit that puts a death-heavy thumb on the scale of the jury's considerations just when the jury is empowered freely to vote for life and mercy rather than death as the ultimate punishment.

I would reverse the decision of the district court as to Walker's conviction, concluding that the shackling did not prejudice Walker by impacting what I think was the inevitable conclusion of the jury on the evidence and jury instructions.  But I would affirm the decision of the district court to grant Walker relief on his death sentence because he should receive another penalty-phase trial at which he is not improperly shackled so that a jury can weigh the aggravating factors relating to his crimes against the mitigating factors of his youth and family relationships before deciding if he is eligible for the punishment of death.  I respectfully dissent in part.