UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARVIN PETE WALKER,

    Petitioner,

v.

RON DAVIS, Acting Warden, California State Prison at San Quentin

    Respondent.

No. C 94-1997 PJH

**ORDER RE CLAIMS 2D AND 20**

## INTRODUCTION

Pursuant to the court's request, the parties have filed merits briefing on Claims 2D and 20 in petitioner's Amended Petition For Writ Of Habeas Corpus. For the following reasons, Claims 2D and 20 are DENIED.

## PROCEDURAL BACKGROUND

Petitioner was convicted and sentenced to death for murder, assault, robbery and other crimes in August 1980. On March 31, 2011, this court, Judge Saundra Brown Armstrong presiding, granted petitioner a writ of habeas corpus on his claim that he was unconstitutionally shackled during his capital trial. In addition, the court granted petitioner's claim that his trial counsel's failure to object to the shackling was prejudicially deficient performance at both the guilt and penalty phases of petitioner's capital trial. The court also

ordered the state to either release or retry petitioner, in compliance with California state law and the United States Constitution.

Respondent subsequently filed a timely notice of appeal from the court's order. The Ninth Circuit reversed the court's grant of the writ of habeas corpus, and remanded the matter to the District Court. Petitioner subsequently appealed the Ninth Circuit's decision to the United States Supreme Court. The Supreme Court denied the petition for writ of certiorari, and the Ninth Circuit issued its mandate to this court. The case was subsequently reassigned to the undersigned district judge. The parties were then ordered to commence proceedings in accordance with the Ninth Circuit's mandate.

The parties submitted briefs regarding the impact of *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011) on this court's decision – prior to the issuance of *Pinholster* – granting petitioner's motion for an evidentiary hearing on Claim 2. The court vacated the earlier grant of an evidentiary hearing, and ordered merits briefing on petitioner's remaining claims to commence. Petitioner subsequently filed a motion to stay, which this court denied. The court ordered the parties to proceed with merits briefing on petitioner's remaining guilt phase claims.

**FACTUAL BACKGROUND**

The following recitation of the factual background of this case is based, in relevant part, on the California Supreme Court's opinion disposing of petitioner's direct appeal, *People v. Walker*, 47 Cal. 3d 605 (1988). The state court's factual findings are presumed to be correct pursuant to 28 U.S.C. § 2254.

In 1980, a jury in the Superior Court of Santa Clara County sentenced petitioner to death following a conviction of first degree murder and other crimes stemming from two separate incidents joined for purposes of trial. Evidence at trial established that, in the first incident, which occurred on August 7, 1979, petitioner and an accomplice robbed a liquor store called Dan's Bottle Shop and shot three people. One of the shooting victims, 15 year old Joseph Vasquez, died from the gunshot wounds. In connection with this incident, petitioner was convicted of first degree murder, two counts of assault with intent to commit

murder, and robbery. The jury also found that petitioner personally used a firearm in the commission of each crime, and found true the special circumstance that defendant committed the murder while engaged in the commission or attempted commission of a robbery.

Evidence at trial also established that, in the second incident, which occurred on September 5, 1979, petitioner entered a medical building, where he then proceeded to rob, sexually molest, beat and shoot a young woman twice in the head. The woman, Rose Olveda, survived and identified petitioner as her assailant. In connection with this incident, petitioner was convicted of assault with intent to commit murder, robbery, and personal use of a firearm in the commission of each offense. He was also convicted of theft of Olveda's vehicle.

Petitioner's defense at the guilt phase was primarily one of mistaken identity. Petitioner testified on his own behalf. Petitioner's testimony on the witness stand was impeached by earlier statements he had made.

At the penalty phase, the prosecution and defense stipulated that the evidence from the guilt phase could be considered by the jury in the penalty phase. In addition, the prosecution presented testimony from two police officers that petitioner had made threats against a police officer and a deputy district attorney. The defense presented witnesses from petitioner's family, including his sisters, who testified that petitioner had helped them financially and emotionally and that they wanted him to live. Petitioner's mother testified that petitioner had grown up in a poor family with seven brothers and sisters. Again, petitioner testified, claiming that he was innocent of the crimes and testifying that he did not make threats to the officer and deputy district attorney.

**LEGAL STANDARDS**

**I.    AEDPA**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this court may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in

3

a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C § 2254(d).[1] A federal court must presume the correctness of the state court's factual findings, and the presumption of correctness may only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of section 2254(d) have separate and distinct meanings. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court's decision is "contrary to" clearly established United States Supreme Court law if it fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id.* at 413-14. A decision is an "unreasonable application" of United States Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. In *Harrington v. Richter*, the Court further stressed that "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" 131 S. Ct. 770, 785 (2011) (citing *Williams*, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004)).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "While the

---

[1] The parties agree that AEDPA applies to this matter.

4

'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts." *Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *See Williams*, 529 U.S. at 412. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark*, 331 F.3d at 1070. A state court's decision need not cite to, and a state court need not be aware of federal law to pass muster under AEDPA; rather, "so long as neither the reasoning nor the result of the state-court decision contradicts [federal law]", the decision may be upheld. *Early v. Packer*, 537 U.S. 3, 8 (2002).

When a federal court is presented with a state court decision that is unaccompanied by a rationale for its conclusions, the court has no basis other than the record "for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such situations, federal courts must conduct an independent review of the record to determine whether the state court decision is objectively unreasonable. *Id.* Specifically, "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

Even if a petitioner meets the requirements of section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced petitioner's defense. *Id.* at 688. To prove deficient performance, petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.; see also Bobby v. Van Hook*, 130 S.Ct. 13, 18 (2009) (*per curiam*) (noting that guidelines, such as those promulgated by the American Bar Association, purporting to establish what reasonable attorneys would do may be helpful but are not the test for determining whether counsel's choices are objectively reasonable). This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687-88.

The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). The reasonableness of counsel's decisions must be measured against the prevailing legal norms at the time counsel represented the defendant. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *see also Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002). A difference of opinion as to trial tactics does not constitute denial of effective assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

Under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 131 S.Ct. at 785. The state decision under review need not explain the state court's reasoning, and the habeas petitioner still bears the burden to show there was no reasonable basis for the state court to deny relief. *Id.* at 784.

To prove counsel's performance was prejudicial, petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A petitioner must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 689. The test for prejudice is not outcome-determinative, *i.e.*, defendant need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. *Id.* at 693.

The *Strickland* prejudice analysis is complete in itself. Therefore, there is no need for additional harmless error review pursuant to *Brecht*, 507 U.S. at 637. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009); *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

## ANALYSIS

### I.   CLAIM 2D

In Claim 2D, petitioner alleges that his counsel provided ineffective assistance by allegedly failing to investigate or pursue a theory of accomplice liability in relation to the Bottle Shop crimes. The claim reads as follows:

> Rupert Lee Harper [petitioner's brother-in-law] was known to have been the "second robber." Ultimately, years after Walker's trial, Harper pleaded nolo contendere to second degree murder charges arising out of the Bottle Shop incident. A telephone "hot line" tip had identified Harper rather than Petitioner as the guilty party. Other investigative materials had suggested that Harper was more likely than Petitioner to have planned the crime and shot the victim. Trial counsel knew, or should have known and

7

> could easily have learned, that Harper had a record of armed robberies while Petitioner did not, and that Harper had threatened the victim of an earlier robbery. Under these circumstances competent trial counsel would have investigated the issue and made an effort to have the jury consider whether, *at a minimum,* Harper rather than Petitioner might have fired the fatal shots. Such an effort might have raised a reasonable doubt on guilt, and might have had an even more substantial effect on penalty.

Amended Petition at 32, ¶¶ 128-129. The California Supreme Court rejected this claim on the merits in a summary opinion.

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Strickland*, 466 U.S. at 691. A claim of negligence in conducting pretrial investigation can form the basis for a claim of ineffective assistance. *See United States v Tucker*, 716 F.2d 576 (9th Cir 1983); *Hines v. Enomoto*, 658 F.2d 667, 676 (9th Cir 1981). Counsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 525 (2003).

Petitioner argues that his attorney did not make a reasonable investigation into the issue of accomplice liability, and that it was unreasonable for the California Supreme Court to conclude to the contrary. Petitioner relies on numerous parts of record that were before the California Supreme Court in support of his argument. For example, petitioner points to the April 1997 declaration of Andrue Jefferson, where Jefferson averred:

> On the night of August 7, 1979, I was at home when Marvin Walker and Rupert Harper arrived. They were extremely agitated, so I inquired what was wrong. Rupert told me he had just committed an armed robbery that had tragic but unintended consequences. Rupert Harper told me that in the course of the robbery, he had used the gun on the proprietors of the liquor store that had been robbed. He said his intention was only to take money from the store and to hurt no one. However, it did not turn out that way. I knew that Rupert Harper had a history of armed robbery while the most serious crime Marvin had committed was burglary. I believe what Rupert Harper told that night which was that he had pulled the trigger and not Marvin.

Amended Petition, Ex. G at 2-3.

Petitioner also relies on the affidavit in support of an arrest warrant for Rupert Lee Harper for the Bottle Shop crimes. In the affidavit, San Jose Police Detective Larry

Demkowski averred that Bottle Shop victim Romero had identified petitioner as one of the perpetrators, and that Romero's description of the second perpetrator matched Harper. Ex. QQ to Exh. 45. His affidavit also stated that, on October 10, 1979 "an anonymous informant phoned the San Jose Mercury News Secret Witness Program and stated that the person who had been arrested as a suspect in the Dan's Bottle Shop robbery/murder was innocent," and that "real suspect" was the arrested suspect's brother-in-law, Rupert Lee Harper. *Id.*

After he was convicted, Harper signed a declaration that he "fired all the shots" during the Bottle Shop robbery. Amended Petition, Ex. E. Harper later recanted this statement at a parole hearing, however, maintaining that he signed the declaration "to help my brother-in-law." Amended Petition, Ex. B at 39-40. At this same parole hearing, Harper stated under oath that he did not know petitioner was armed during the Bottle Shop robbery, and that he did not have anything to do with the shooting or the other assaults on the victims. *Id.* at 14-15, 23. Harper admitted that he fled after the crime, and stated that he pleaded *nolo contendere* to second-degree murder because he did not want to "tell" on petitioner. *Id.* at 14-15.

As the Supreme Court has made clear, petitioner bears the burden of showing that there was no reasonable basis for the state court to deny relief. *Richter*, 131 S.Ct. at 784. Based on the record, petitioner cannot demonstrate that the California Supreme Court's decision denying this claim was objectively unreasonable.

To begin with, petitioner cannot demonstrate that there was no reasonable basis for the state court to have concluded that counsel's performance was not deficient. Petitioner argues that his counsel should have presented a theory of accomplice liability to the jury, and argued that Harper, as opposed to petitioner, might have fired the fatal shots. Doing so, however, would have conflicted with petitioner's testimony that he was innocent of the Bottle Shop crimes, and was not even present at the store at any time on August 6, 1971. RT at 2521. As the Ninth Circuit has held, tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available, *Bashor*, 730

9

F.2d at 1241, and it would have been reasonable for the California Supreme Court to conclude that it was a tactical decision for petitioner's attorney to present an innocence defense.

Furthermore, presenting an alternative defense of accomplice liability would have been inconsistent with a claim of innocence, and a decision to not present inconsistent defenses does not amount to deficient performance. *See, e.g., Turk v. White*, 116 F.3d 1264, 1266-67 (9th. Cir 1997) (finding that presentation of conflicting defense theories may confuse jury, and that once defense counsel reasonably chose to present a particular defense, his duty to investigate a conflicting defense ended.)  Here, it was reasonable for counsel to present an innocence defense, as it had the potential to completely exonerate petitioner, which the accomplice liability defense did not.

In support of this claim, petitioner relies on *Rios v. Rocha*, 299 F.3d 796, 805-08 (9th Cir. 2002), where the Ninth Circuit found that it was deficient performance for trial counsel to have presented an unconsciousness defense instead of a misidentification defense, when there were multiple potential eyewitnesses available. *Rios*, however, is distinguishable from petitioner's case. To begin with, *Rios* is a pre-AEDPA case, and therefore the claim was reviewed *de novo*, and not through AEDPA's deferential lens. *Id*. at 799 n. 4.  In addition, counsel in *Rios* made a choice to not investigate and present a defense (misidentification) which had the potential to exonerate his client. *Id.* at 805-08. Here, as discussed *supra*, counsel chose the defense (innocence) that could have exonerated his client, as opposed to the inconsistent defense (accomplice liability) that would not have exonerated him.  Under the circumstances, the decision of petitioner's trial counsel cannot be demonstrated to be unreasonable.

Furthermore, petitioner cannot show that it was unreasonable for the state court to conclude that any deficient performance did not result in prejudice.  It is not clear that evidence petitioner relies upon in support of this claim would even have been admissible or available at the time of his trial.   For example, Andrue Jefferson did not aver in his declaration that he would have actually testified at trial.  Amended Petition Ex. G at 3.  *See,*

*e.g., United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (finding that where the record does not reveal that a declarant would have testified at trial, the ineffectiveness claim premised on the declaration is without merit).

In addition, the California Supreme Court could have reasonably concluded that the evidence supporting a finding that petitioner was the shooter was so strong that there was no reasonable probability that evidence against Harper would have changed the verdict. As the state court found when addressing an instructional error claim:

> It is undisputed that defendant was armed with the handgun upon initiating the robbery of the liquor store. After defendant personally removed the money from the cash register his accomplice stated, "Come on. We got the money. Let's get out." Defendant replied, "No. We're not going to leave any witnesses." Defendant marched the victims back into the rear of the store at gunpoint. He handed the gun to his partner, then twice struck Romero across the head with two full bottles of wine. When Romero pretended to be dead, defendant removed Romero's wallet from his back pocket, felt his back pocket and said, "We don't have to worry about this guy any more."
>
> Neither of the surviving victims directly observed defendant regain possession of the gun or fire the ensuing volley of shots. However, Romero testified that defendant's companion, who "had a very boyish look to his face," remained passive throughout the incident and at no time exhibited any threatening or violent behavior. Romero observed defendant walk over to Zamora and Vasquez and order the boys to their knees. As the victims pleaded for their lives three shots were fired off in rapid succession; Vasquez and Zamora were each shot through the front of the head. The execution-style shooting clearly evinces an intent to kill. The nature and location of the wounds, together with Romero's testimony, strongly supports an inference that defendant momentarily handed the gun to his companion so he could hit Romero over the head with the wine bottles, then took his gun back, stood in front of his victims and fired the shots.
>
> Defendant used the same handgun several weeks later to rob and twice shoot victim Rose Olveda in the head; the jury concluded from such evidence that he had assaulted her with intent to commit murder. Subsequent to the commission of these offenses defendant remained in possession of the handgun, admitted ownership of it when he sold it to undercover Officer MacIvor, and told the officer it "had done a murder." The jury found that defendant had personally used the gun in connection with the murder of Vasquez, the robbery of Olveda, and the assaults with intent to commit murder upon Romero, Zamora and Olveda.

*Walker*, 47 Cal. 3d at 631-32.

Given the above, petitioner cannot show that the California Supreme Court's decision denying this claim was unreasonable. *See Schriro*, 550 U.S. at 473. Accordingly Claim 2(D) is DENIED.

## II. CLAIM 20

In Claim 20, petitioner alleges selective prosecution based on his race. The claim reads as follows:

> Petitioner's confinement is unlawful insofar as his conviction and death sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and their state analogues because Petitioner was selected for capital prosecution based on arbitrary, constitutionally irrelevant, and/or impermissible and discriminatory factors, including but not limited [to], prosecutorial vindictiveness, [and] race and political considerations. Petitioner's charging, trial, conviction and sentence all resulted from invidious and systemic discrimination by Santa Clara County prosecutors in charging and pursuing the death penalty, and by judges and jurors imposing it, based on the racial identities of the victim and defendant.

Amended Petition at 98-100. This claim was denied by the California Supreme Court on the merits in a summary opinion.

A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996). Although the decision whether to prosecute and what charges to bring generally rests entirely in the prosecutor's discretion, this discretion is subject to constitutional constraints. *Id.* at 464. One of these constraints is that the prosecutorial decision may not violate equal protection by resting on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.*

Courts presume that prosecutors have properly discharged their official duties. *See id.* In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Id.* at 465 (citation omitted). Unsupported allegations of selective prosecution are not enough. *See United States v. Davis,* 36 F.3d 1424, 1433 (9th Cir. 1994); *see also United States v. Buffington*, 815 F.2d 1292, 1305 (9th Cir. 1987) (finding that speculation of selective prosecution by

12

black defendant previously acquitted of officer's murder, without additional proof, insufficient to establish selective prosecution.)

A prosecutor's charging decision cannot be judicially reviewed absent a prima facie showing that it rested on an impermissible basis, such as gender, race or denial of a constitutional right. *See United States v. Diaz*, 961 F.2d 1417, 1420 (9th Cir. 1992). To establish a prima facie case of selective prosecution, the claimant must show that the prosecutorial policy: 1) had a discriminatory effect; and 2) was motivated by a discriminatory purpose. *See Armstrong*, 517 U.S. at 465.

Petitioner argues that the allegations in his petition before the California Supreme Court stated a prima facie case of selective prosecution that should have entitled him to discovery and an evidentiary hearing. Those allegations are as follows:

> 415. The Santa Clara's District Attorney's Office is given extensive discretion to choose the individuals to be capitally charged and to decide which cases to bring to trial.
>
> 416. The Santa Clara District Attorney's selection process is exercised in an arbitrary and capricious manner and is based on inconsistent and undisclosed criteria, including the racial identities of the defendants and victims.
>
> 417. Petitioner is a poor black man who was tried in 1980 for the murder of a Hispanic man, who was portrayed by the District Attorney as a white male, and the attempted murder of two Hispanic males and a Hispanic woman. The District Attorney joined the two unrelated incidents for trial, charged Petitioner with special circumstances and vigorously pursued the death penalty against him.
>
> 418. No members of Petitioner's race sat on the jury which convicted him and sentenced him to death, and trial counsel failed to effectively conduct voir dire to discover racial prejudice and to prevent it from infecting the proceedings. Inappropriate, racist remarks made by the district attorney throughout the proceedings demonstrate that the jury was presented with and influenced by racial prejudices. The impact of these prejudices made it more likely that Petitioner would be convicted and sentenced to death because he is black (and the victim portrayed as white) than if Petitioner was white.
>
> 419. The District Attorney's Office and individuals from that office involved in the decision-making process in Petitioner's case charged him and prosecuted him for capital murder because he is a black male, and his alleged victim was portrayed as white.
>
> 420. Petitioner was sentenced to death pursuant to a pattern and practice of racial discrimination in the administration of the criminal justice system in Santa Clara County and the State of California.

> 421. Petitioner has so far been precluded from discovering, compiling and presenting all available evidence that will prove the intentional, racially discriminatory charging of capital murder against him due to the prohibitions on discovery at this stage of proceedings, including but not limited to circumstantial evidence of the Santa Clara Country District Attorney's discriminatory, non-random capital charging patterns, disparate treatment of witnesses and victim survivors by members, representatives and agents of Santa Clara law enforcement agencies, including but not limited to the District Attorney's Office, and a pattern and practice of intentional exclusion of non-white prospective jurors for constitutionally impermissible reasons related to race.
>
> 422. Similarly situated non-black defendants and similarly situated defendants who were alleged to have killed non-white victims have not been capitally charged. There were numerous murder cases in Santa Clara at or about the time of the crimes for which Petitioner was charged which were more aggravated than this one – taking into account both the circumstances of the crime and those of the offender – in which the District Attorney did not seek the death penalty and which were resolved with sentences of life imprisonment or less.
>
> 423. Petitioner alleges, on information and belief, that statistical data will show a disparity in the charging, prosecuting and sentencing of defendants who were or could have been charged and tried capitally based on the race of defendant and race of victim and that such disparity demonstrates that the District Attorney's charging practices and jurors' and judges' sentencing decisions in capital cases in California generally and in Santa Clara specifically are based in part on the race of the defendant and the race of the victim.
>
> 424. Petitioner was sentenced to death in a criminal justice system marred by [a] long history of discrimination. Racial discrimination has also been a pervasive element in the Santa Clara community. With regard to Petitioner's case, the death penalty was imposed in response to the momentary passions and enduring prejudices of the community, not as a consistent or equitable instrument of the law.
>
> 425. Were it not for the fact that the victim in this case was portrayed as white and that Petitioner is black and poor, this case would not have been capitally charged and defendant would have not been sentenced to death.
>
> 426. As a result of the foregoing, Petitioner was deprived of his rights to equal protection and due process of law, to a fair trial, to an impartial jury, and to the effective assistance of counsel which are guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution.
>
> 427. As a result of the foregoing, Petitioner was deprived of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a reliable determination of his factual innocence of capital murder and to a reliable, non-arbitrary, individualized determination of whether death is the appropriate penalty in his case.

Amended Petition at 98-100.

14

Petitioner cannot show that the California Supreme Court's summary decision denying this claim was objectively unreasonable under clearly established federal law. In other words, petitioner cannot demonstrate that he made a prima facie showing under *Armstrong* such that the California Supreme Court could not reasonably have denied his claim without an evidentiary hearing.

There is a presumption that prosecutors have constitutionally discharged their duties. *Armstrong*, 517 U.S. at 464 (confirming that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion") (internal quotations and citation omitted). In order to rebut that presumption and establish a prima facie case, defendants must present some evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Id.* at 469.

Petitioner's conclusory allegations in his Amended Petition are not "evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Id.* His allegations are without factual support, and as such, it was not unreasonable for the California Supreme Court to conclude that he had not established a prima facie case. It is within the purview of a reviewing court to "not accept conclusory allegations" such as petitioner's, *Pinholster*, 563 U.S. at 189 n.12, especially since habeas petitioners are entitled to include copies of readily available documentary evidence in support of their claims, including relevant portions of trial transcripts, affidavits or declarations. *In re Harris*, 5 Cal.4th 813, 827 n.5 (1993).

Petitioner cites to no evidence in support of the allegations in his petition; for example, there are no cites to the prosecutor's alleged racist remarks throughout the proceedings, which presumably would be in the trial record. Amended Petition at 99. Indeed, even allegations with evidentiary support may not amount to a prima facie case. In *Armstrong*, for example, the Court concluded that a proffered study listing defendants by race, and whether they were prosecuted for dealing cocaine as well as crack, did not

constitute "evidence of differential treatment of similarly situated members of other races or protected classes" and thus was not sufficient to warrant discovery on a claim of selective prosecution. 517 U.S. at 469-70. Accordingly, petitioner cannot demonstrate that it was objectively unreasonable for the California Supreme Court to deny this claim on the merits without an evidentiary hearing. Claim 20 must be DENIED.

## CONCLUSION

For the foregoing reasons, Claims 2D and 20 are DENIED. Within 35 calendar days of the date of this Order, the parties are ORDERED to meet and confer, and to submit a proposed briefing schedule to resolve the remaining claims, specifically the remaining ineffective assistance of counsel sub-claims in Claim 2, and Claim 22.

**IT IS SO ORDERED.**

Dated: April 28, 2016

PHYLLIS J. HAMILTON
United States District Judge