UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVIN PETE WALKER, JR.,<br><br>Petitioner,<br><br>v.<br><br>RON DAVIS, Warden, California State Prison at San Quentin,<br><br>Respondent. | Case No. 94-cv-01997-PJH<br><br>**ORDER GRANTING PETITION IN PART AND DISPOSING OF ALL REMAINING CLAIMS**<br><br>**DEATH PENALTY CASE** |

## I.    INTRODUCTION

Pursuant to the Court's request, the parties have filed merits briefing on all remaining penalty phase claims including Claims 2A, 2E, 2F, 16, 19B(e), 19B(f), 19B(aa), 19B(cc), 21, and 22 in Petitioner's Amended Petition for Writ Of Habeas Corpus.  For the reasons set forth below, the Court orders as follows.

## II.    BACKGROUND

### A.    Procedural Posture

On November 20, 1979, an eight-count information was filed in Santa Clara County Superior Court.  The information charged Petitioner with one count of first-degree murder, four counts of assault with intent to commit murder, two counts of robbery, and one count of auto theft.

On June 30, 1980, the trial of the guilt phase began.  The jury acquitted Petitioner of one count of assault but convicted him of the other charges on August 4, 1980.  On August 5, 1980, the penalty trial began.  The jury sentenced Petitioner to death on August 12, 1980.

On automatic appeal to the California Supreme Court, Petitioner's conviction was affirmed but his death sentence was reversed.  On March 20, 1986, the California Supreme Court granted Respondent's petition for rehearing.  On December 27, 1988, the 1985 opinion was vacated and the judgment was affirmed in its entirety.

A petition for writ of certiorari to the United States Supreme Court was filed on June 12, 1989, and denied on March 19, 1990.  On September 28, 1990, Petitioner filed a petition for writ

of habeas corpus in the California Supreme Court. That petition was denied on September 30, 1992.

On January 28, 1993, Petitioner applied to the United States Supreme Court for a writ of certiorari to review certain constitutional claims. On March 8, 1993, the United States Supreme Court denied the petition for certiorari. This denial became final on April 2, 1993.

On May 20, 1997, Petitioner filed a petition for writ of habeas corpus with this Court. Dkt. 84. The Court found that some of Petitioner's claims were not exhausted and ordered Petitioner to withdraw the petition filed on May 20, 1997. The Court ordered that equitable tolling would apply if Petitioner filed a state court petition for writ of habeas corpus, then a federal petition after the state had ruled.

The California Supreme Court ruled on Petitioner's June 5, 1998 petition for writ of habeas corpus on December 22, 2004.

On January 12, 2005, Petitioner filed an amended petition for writ of habeas corpus in this Court. Dkt. No. 130 ("Fed. Pet."). Respondent filed an answer on March 24, 2005. Dkt. 139 "Resp. Answer"). No traverse was filed. After extended litigation and briefing, the Court disposed of several claims pursuant to a motion for summary judgment, Dkt. No. 161, granted Petitioner leave to depose his trial attorneys, Dkt. No. 176, and partially granted Petitioner's request for an evidentiary hearing, Dkt. No. 189. On March 31, 2011, the Court, Judge Armstrong presiding, partially granted the amended petition for writ of habeas corpus based on Petitioner's allegations of erroneous shackling. Dkt. No. 199. An appeal ensued and the Ninth Circuit reversed the Court's order. *See* Dkt. No. 213. The parties subsequently resumed briefing on the remaining groups of claims on April 18, 2014. Dkt. No. 220. The Court disposed of Petitioner's guilt phase claims, excluding his claim of insufficient evidence to support the jury's finding that Petitioner personally used a gun during the commission of one of the crimes, on April 28, 2016. Dkt. No. 245.

On March 31, 2017, Petitioner filed an opening brief on ineffective assistance of counsel during the penalty phase, several procedurally defaulted claims, and a claim of cumulative error. Dkt. No. 251 ("Pet. Br."). Respondent filed an opposition on June 29, 2017. Dkt. No. 255

("Resp. Br."). On August 14, 2017, Petitioner filed a reply, which included briefing on his guilt phase claim of insufficient evidence to support the jury's finding that he personally used a gun during the commission of one of the crimes. Dkt. No. 256 ("Pet. Reply Br.").

### B. Facts

The following recitation of the factual background of the underlying crimes is based, in relevant part, on the California Supreme Court's opinion disposing of Petitioner's direct appeal. The state court's factual findings are presumed to be correct pursuant to 28 U.S.C. § 2254. *See People v. Walker*, 47 Cal.3d 605 (1988).

In 1980, a jury in the Superior Court of Santa Clara County sentenced Petitioner to death following a conviction of first-degree murder, three counts of assault with intent to commit murder, two counts of robbery, and one count of auto theft.

Petitioner was tried in connection with two incidents, which occurred in August and September of 1979. The first incident occurred on August 6, 1979, when Petitioner and a second man[1] entered Dan's Bottle Shop in San Jose in which the co-owner, Jerry Romero, and two employees, Joe Vasquez and Andy Zamora were present. Petitioner drew a handgun from his waistband before announcing a holdup and marched Romero, Vasquez, and Zamora into the shop's back room. As they entered, Romero saw Petitioner hand the gun to his companion. Petitioner hit Romero across the forehead with a full wine bottle, and, as Romero fell to the floor, Petitioner struck him again over the head with a second full bottle of wine. Petitioner ordered Vasquez and Zamora to get on their knees. Three shots were then fired in rapid succession. Vasquez died of a .32 caliber gunshot wound, which entered his forehead and exited through the back of his head. Zamora was also shot in the head but survived. Romero was shot in the abdomen; the bullet ricocheted off his hip and traveled through several major organs, lodging in his chest.

The second incident occurred on September 5, 1979. The evidence showed Petitioner,

---

[1] The second man was Petitioner's brother in law, Rupert Lee Harper. *See* Fed. Pet. at 116-119. On November 9, 1982, Harper pled nolo contendere to second degree murder in the Bottle Shop case and was sentenced to fifteen-years-to-life in prison. *Id.*

wearing a ski mask, entered a medical building in San Jose and pointed a gun at 20-year-old Rose Olveda. Petitioner ripped open her blouse, touched her breasts, and began pistol-whipping her on the head, striking Olveda an estimated twelve times before she was able to momentarily break away and run for the door. Petitioner pulled her towards him and continued beating her, injuring her back and fracturing her neck. Olveda fell to the floor and pretended to be unconscious. Petitioner then shot her twice in the head. Olveda survived.

Following the assault on Olveda, law enforcement located her car parked near Petitioner's sister's residence, where Petitioner sometimes stayed. Officers also recovered, through an undercover operation, a .32 caliber semi-automatic pistol that was later identified as the gun used during the liquor store incident.

### C. Penalty Phase Evidence

At the penalty phase, the prosecution and defense stipulated that the evidence from the guilt phase could be considered by the jury in the penalty phase. In addition, the prosecution presented testimony from two police officers that Petitioner made threats against an undercover police officer, Evan MacIvor ("MacIvor") and a deputy district attorney. The defense presented witnesses from Petitioner's family and church, including his mother, Emma Lou Walker ("Emma"), two of his sisters, a secretary from his church, and Petitioner's girlfriend, who testified that Petitioner had helped them with chores, financially, and emotionally, and that they wanted him to live. Petitioner's mother testified that Petitioner had grown up in a poor family with seven brothers and sisters. Petitioner also testified, claiming that he was innocent of the crimes and denying the alleged threats against MacIvor and the deputy district attorney.

### D. Petitioner's Proffered Mental Health Evidence[2]

During his state and federal habeas proceedings, Petitioner submitted the declarations of several mental health experts. The Court will briefly summarize their proffered testimony.

#### 1. Dr. Dale G. Watson

Dr. Dale G. Watson ("Dr. Watson") was a licensed psychologist who conducted a

---

[2] For ease of reference, the page numbers listed in each citation to Petitioner's exhibits reflect ECF document page numbers, not the page number in each exhibit.

comprehensive neuropsychological assessment of Petitioner on February 4, 1997 and February 11, 1997. Dkt. 130-1 at 53 (Exh. I, Dr. Watson Decl.). Dr. Watson received his Ph.D. from U.C. Berkeley, served as a member on the panel of examiners for Contra Costa County Superior Courts, and had substantial experience in performing psycho-diagnostic tests with prisoners before examining Petitioner. *Id.* at 51-52.

Dr. Watson's assessment included a clinical interview and administration of a battery of neuropsychological tests, totaling approximately ten hours of face-to-face contact with Petitioner, at San Quentin State Prison. Dkt. 130-1 at 53 (Exh. I, Dr. Watson Decl.). According to Dr. Watson's declaration, "[t]he purpose of this evaluation was to determine if neuropsychological dysfunction or deficits were present and to specify the degree, nature, and effect of any such impairment." *Id.* at 54.

Dr. Watson concluded Petitioner suffers from "a mild level of neuropsychological dysfunction." Dkt. No. 130-1 at 60 (Exh. I, Dr. Watson Decl.). Factors contributing to Petitioner's brain damage included an accident in which Petitioner was hit by a truck when he was nine years old, repeated blows to the head during beatings by his father, Marvin Pete Walker, Sr.[3] ("Marvin, Sr."), a severe blow to the base of Petitioner's skull, and chronic malnutrition. *Id.* at 57. Dr. Watson found that the "measure of the consistency of findings of brain impairment" fell "within the brain damaged range both with and without age and education adjustments." *Id.* at 61. Dr. Watson opined that Petitioner's brain damage also affected his ability to learn and succeed academically, noting that Petitioner "likely . . . has a long-standing learning disability that is the result of underlying brain dysfunction." *Id.* at 67.

Dr. Watson also identified various other factors that may have contributed to the state of Petitioner's mental health, including his stutter as a young child, the severe beatings he and his siblings suffered at the hands of their father, and his near-death experience after he and his brother contracted meningitis, which his brother did not survive. Dr. Watson also noted the murder of

---

[3] Given the various surnames in common among Petitioner's proffered penalty phase witnesses, the Court will refer to some witnesses by their first name for ease of reference. The Court intends no disrespect by doing so.

Petitioner's sister, Lena Doris Walker ("Lena"), whom Petitioner found "completely naked [and] bleeding profusely" at the feet of her estranged ex-husband, and the negative effects stemming from Emma's relationship with James Ratliff ("Ratliff"), Petitioner's chronic use of illegal substances, and an attempted sexual assault by a preacher when Petitioner was fifteen or sixteen years old. Dkt. 130-1 at 58 (Exh. I, Dr. Watson Decl.).

## 2. Dr. Roderick W. Pettis

Dr. Roderick W. Pettis ("Dr. Pettis") was a licensed clinical physician who evaluated Petitioner's social and psychiatric history to determine which factors affected his development, mental status, and psychological functioning. Dkt. 130-1 at 75 (Exh. J, Dr. Pettis Decl.). Dr. Pettis received his M.D. from Boston University, served as a consultant in the Massachusetts Department of Public Health, and had substantial experience as a psychiatrist in treating adult patients with a full range of mental disorders before examining Petitioner. *Id*. at 72-73. Like Dr. Watson, Dr. Pettis conducted a number of interviews of Petitioner at San Quentin State Prison. Dr. Pettis also consulted with Dr. Watson and reviewed documentary evidence concerning Petitioner's education, employment, medical, psychological, and psychiatric history, as well as documentary evidence concerning members of Petitioner's family. *Id.* at 74.

Dr. Pettis concluded that Petitioner suffered from various family life and community deficits and that Petitioner lacked the resources necessary to overcome those deficits. For example, Petitioner did not have "a positive relationship with a competent adult, skill at learning, a positive school experience, previous successful experience, social competence, [or] a high IQ score." Dkt. No. 130-1 at 176 (Exh. J, Dr. Pettis Decl.). Dr. Pettis also examined some of the potential causes of Petitioner's "long-standing" brain damage. *Id.* at 172. First, Petitioner suffered systematic and ritualized beatings by Marvin, Sr., "which at times constituted torture, affected every aspect of his development and life, including brain function, emotional responses, perception of the world around him, beliefs about himself, sense of personal integrity, and relationships with others." *Id.* at 175. Second, Petitioner "did not receive basic essentials for normal development. When a child is born, the development of the central nervous system, including the brain, is not complete. . . . [Petitioner's] [m]alnourishment, combined with his

6

prenatal exposure to alcohol, and brain trauma impaired his cognitive functioning." *Id.* at 171. Third, Petitioner "experienced sym[p]toms that are characteristic for those who witness and survive overwhelming events that are outside the range of normal human experiences." *Id.* at 139. Dr. Pettis also pointed to Petitioner's "intrusive thoughts" about his sister's murder, in which Petitioner could not get images "out of his mind of [his murdered sister] lying naked and covered in blood on the stairwell, dead." *Id.* at 140.

In addition, Dr. Pettis detailed Petitioner's upbringing and his extended family's history, including the family's poverty, near-constant instability, cultural and community issues, and various forms of abuse suffered by Petitioner, his parents, and his siblings.

### E. Other Proffered Evidence

Petitioner also provided the declarations of witnesses who were willing and ready to testify regarding Petitioner's personal, cultural, and family background.

#### 1. Vernelle Walker Harper

In her declaration, Vernelle Walker Harper ("Harper"), one of Petitioner's sisters, described her family's constant moves and her traumatic childhood. Dkt. No. 131 at 26-31 (Appx. A, Exh. 4, Harper Decl.). The Walker family lived in the housing projects in South Central Los Angeles when Petitioner was born. *Id.* at 25. They had moved twice by the time the youngest children, twin Ronald and Donald Walker ("Ronald" and "Donald," respectively), were born. *Id.* at 26. After the twins' first birthday, the family left for Tulare. The children moved with no advanced notice from their parents and no explanation as to why. *Id.* at 27. The Walker family continued moving from city to city over the years. *Id.* at 29-30.

Harper also described a chaotic childhood in which she and her siblings were often alone or otherwise unsupervised in their home with up to twenty children. The children inevitably got into trouble and were thereafter physically beaten by one or both of their parents. Dkt. No. 131 at 31 (Appx. A, Exh. 4, Harper Decl.). Marvin, Sr. took out his anger on the children by using an electrical cord to "whip" each of them, regardless of each child's personal blame. *Id.* at 29-30. When Petitioner's parents fought, Petitioner "sometimes tried to go between them, but that only made [Marvin, Sr.] beat [Petitioner]." *Id.* at 30.

In 1969, Ronald died suddenly of meningitis. Dkt. No. 131 at 32 (Appx. A, Exh. 4, Harper Decl.). Ronald went to bed and was found dead the next morning. That same day, Petitioner also contracted meningitis and had to be hospitalized with a 107-degree fever. *Id*. Following Ronald's death, Petitioner took it upon himself to care for his younger brother, Donald, who was having a difficult time with Ronald's death. *Id*. In 1971, Petitioner's father left the family. The family continued moving from one city to another, eventually returning to San Jose. *Id*. at 33.

That same year, Petitioner's nineteen-year-old sister, Lena, left her husband, who was violent. Dkt. No. 131 at 34 (Appx. A, Exh. 4, Harper Decl.). By then, Marvin, Sr. had left the family and decided he was not returning. Petitioner, who was twelve years old, decided it was his job to protect his mother and sisters. *Id*. at 35. When Lena's husband showed up at the Walker home and threatened to take the couple's children, Petitioner grabbed the three children, including a newborn infant, and ran out the back door to a neighbor's house to protect them. *Id*.

In early 1972, the children's beloved maternal grandmother, to whom the children referred to as "Mamun," passed away. Later that year, Lena was murdered by her estranged husband. Dkt. No. 131 at 36 (Appx. A, Exh. 4, Harper Decl.). Petitioner "had seen his dying sister lying naked and bleeding with her killer still holding the knife over her body, and he could not shake the sight. He saw his mother more devastated than ever, and he did not know what to do about it. He started following [his sisters] around whenever we left the house in his attempt to keep [them] from danger." *Id*. In addition, the Walker family was unable to gain custody of Lena's children. Petitioner blamed himself for Lena's death and felt like he failed as the man in the family. *Id*. Meanwhile, Petitioner's mother and siblings turned to alcohol and drugs for relief. *Id.* at 36-37.

In 1973, James Ratliff ("Ratliff"), who was seeing Emma, moved in with the family. Dkt. No. 131 at 37 (Appx. A, Exh. 4, Harper Decl.). Ratliff attempted to molest and sexually coerce Petitioner's sisters. He also taught Petitioner's brothers how to get more money back in change from a merchant than what they paid for an item. *Id*. According to Harper, Ratliff's presence in the family home brought more turmoil between Petitioner's mother and her children.

In addition to providing background information on Petitioner's life, Harper, who testified at the penalty phase of Petitioner's trial, noted that she would have testified in a completely

different manner had Petitioner's counsel asked her questions about Petitioner's home and family life. She also noted she would have provided counsel with a list of other witnesses to contact who could shed some light on Petitioner's history and included a list. Dkt. No. 131 at 38-39 (Appx. A, Exh. 4, Harper Decl.).

### 2. Marlene Walker Holland

Marlene Walker Holland ("Holland") is another of Petitioner's sisters. Like Harper, Holland described her and Petitioner's home life as "impossible to have a quiet minute or time to yourself" and noted that none of the children had any privacy. Dkt. No. 131 at 43 (Appx. A, Exh. 5, Holland Decl.). Holland also shared details about the family members who lived with the Walker family at various times, including her aunt, uncle, and their children, noting that her aunt had a special needs daughter.

In addition, Holland described Marvin, Sr.'s practice of "whipp[ing]" his children over their minor infractions and those of other children in their home during the family's frequent pinochle parties. Dkt. No. 131 at 45 (Appx. A, Exh. 5, Holland Decl.). According to Holland, the children tried to please their father, but could not avoid his beatings. Marvin, Sr. forced the children to line up and watch as he made each child bend down and grab his or her ankles and hit their behind multiple times with an extension cord, "braided switch," or a belt. *Id.* at 46. Holland stated she believed Marvin, Sr. enjoyed hurting his children and described an occasion in which one of her brothers fell off the back of the family's pickup truck, injuring himself, and her father physically beat him in response. *Id.* at 47. On another occasion, Lena argued with Marvin, Sr. about the way he treated the children and Petitioner's father choked her "until she turned blue in the face [and Emma] . . . hit [Marvin, Sr.] on the back of his head with something and he blacked out." *Id.* Despite the violence suffered by himself and his siblings, Petitioner continued to seek approval from his father even after he left the family.

Holland echoed Harper's declaration in describing Ratliff's sexually abusive behavior, alcoholism, and drug use. Holland added that she believed Ratliff may have "messed with [her] brothers as well." Dkt. No. 131 at 50 (Appx. A, Exh. 5, Holland Decl.). She also recounted the deaths of Ronald and Lena, describing Petitioner as a "silent sufferer" who kept his feelings of

9

distraught to himself. *Id.* at 53. Nevertheless, Petitioner helped his family as much as he could. For example, one month prior to Petitioner's arrest, Petitioner's family had no food to eat and Petitioner made a trip to Tulare, California, to fish for food for his family. Petitioner returned with eight bags of fish. *Id.* at 49.

Holland's declaration included a list of potential penalty phase witnesses she would have turned over to defense counsel if he had asked for her help.

### 3. Johnny Keith Walker

Johnny Keith Walker ("Johnny") is Petitioner's brother. In his declaration, Johnny detailed his childhood hardships and described Marvin, Sr.'s abusive behavior, the role of alcohol in his family's violence problems, and the deaths of his siblings and his grandmother, Mamun. Dkt. No. 131 at 145-151 (Appx. A, Exh. 7, Johnny Decl.). Like his sisters, Johnny described the "Line-up Session[s]," in which Marvin, Sr. lined up the children for a "whipping." He also described "Lay Down Session[s]," in which four or five of the children laid down side-by-side on the floor to be "whipped" at the same time. *Id.* at 146. If the children tried to protect themselves during the beatings, Marvin, Sr. hit them harder. *Id.* at 147. The children, including Petitioner, "learned quickly to never speak up for each other or to talk back during his whipping frenzy for fear of getting his special attention." *Id.* Because Petitioner was the oldest son, he was often "in the line of fire more than anyone." *Id.* Petitioner often tried to be the peacemaker in his family whenever there were any fights. On one occasion, one of Petitioner's sisters threw an ashtray at Petitioner's head after he tried to intervene while she fought with her husband. Petitioner's head split open. *Id.* at 152.

Johnny recounted how Marvin, Sr. "beat up" Emma, sometimes giving Emma a black eye or bruising her face. Dkt. No. 131 at 147 (Appx. A, Exh. 7, Johnny Decl.). When police officers went to the home after Marvin Sr. and Emma's disputes, the children were too afraid to say any negative things about their father to the police officers. *Id.* Emma also hit the children, often slapping them. Johnny recalled a specific instance in which Emma hit him with a metal pipe after he said "no" to one of her requests. *Id.* at 148.

In addition to detailing his immediate family's issues, Johnny notes widespread alcohol

abuse within his extended family. Emma often drank hours at a time, especially after Lena's death. Dkt. No. 131 at 148 (Appx. A, Exh. 7, Johnny Decl.). His father and sisters also drank heavily. Emma's nephew, who was often around the Walker family home, got into "terrible, violent drunken fights" with his wife in front of the children. *Id.*

Johnny also discussed some of the issues which arose when Ratliff moved in with the family. According to Johnny, Ratliff tried to have sex with two of his sisters, leading the women to move out of the Walker home and into an apartment in a neighborhood that was "not in a good part of town." Petitioner, at the time fourteen years old, moved in with his sisters to protect them. Ratliff was also a "petty criminal and con artist" who taught the children how to steal and commit residential burglaries, sometimes joining the children when they committed the various crimes. Dkt. No. 131 at 151 (Appx. A, Exh. 7, Johnny Decl.).

Johnny's declaration included a list of several potential penalty phase witnesses he would have sent to counsel had counsel consulted with him.

### 4. Shirley Anne Walker

Shirley Anne Walker ("Shirley") is one of Petitioner's sisters. In her declaration, she summarized the family's constant moves from Los Angeles, Tulare, Oakland, and San Jose. Dkt. No. 131 at 176-186 (Appx. A, Exh. 19, Shirley Decl.). Like other family members who provided a declaration, Shirley described Ronald's death, Lena's death, her grandmother Mamun's death, Marvin, Sr.'s brutal beatings of his children, and the Walker children's fear of Marvin, Sr. *Id.* at 178-85.

According to Shirley, during beatings, Marvin, Sr. pulled the children and placed them at the back of the line for a second beating if they cried or let go of their toes. Shirley also alleged that the other adults present during their beatings laughed at the children and called them names. Shirley and her other siblings regularly asked Petitioner to do things that they knew would lead to a beating, such as cooking a fish belonging to their father or grabbing a peach from their father's peach tree. Dkt. No. 131 at 179 (Appx. A, Exh. 19, Shirley Decl.). She also stated that they often went to bed hungry and had very few clothes to wear to school. *Id.* at 182. Their mother did not allow the children to get summer jobs because she did not want others to know she could not take

care of her children by herself. *Id.*

Following Lena's murder, Shirley and her other siblings, with the exception of Petitioner, used drugs to ease their pain. Dkt. No. 131 at 185 (Appx. A, Exh. 19, Shirley Decl.). According to Shirley, losing Lena was like "losing a mother." *Id.* at 184. Petitioner and Holland "had bad dreams for a long time after Lena was murdered," and Petitioner, at the time twelve years old, blamed himself for Lena's death. *Id.* at 185. Shirley also described Ratliff's repeated attempts to molest her and her sisters while they slept, Ratliff's "corrupt[ing]" influence on her brothers, and her own suicide attempt after Emma disbelieved Shirley's allegations against Ratliff. *Id.* at 186.

Shirley also described some of Petitioner's good character traits. First, described Petitioner's devotion to protecting his family. Petitioner tried to get his family to stop using drugs, protected his sisters, and was the only child who had a job to make sure his mother had money. Dkt. No. 131 at 186 (Appx. A, Exh. 19, Shirley Decl.). Moreover, in Tulare, Petitioner spent time with mentally disabled children that two of his aunts looked after. *Id.* at 182. If any of the siblings made fun of the mentally disabled children, Petitioner scolded them and explained why they deserved to be loved as well. *Id.*

Shirley noted that counsel never asked her about other potential mitigation witnesses and listed several witnesses she would have referred counsel to if he had asked for her help.

### 5. Debra Walker Jefferson

Debra Walker Jefferson ("Jefferson") is Petitioner's sister. Dkt. No. 131 at 60 (Appx. A, Exh. 6, Jefferson Decl.). In her declaration, Jefferson described growing up in poverty, working on farms picking fruits and vegetables as a child, and the family's various living situations. *Id.* at 63.

Like her siblings, Jefferson alleged that her father "whipped" the Walker children "a lot" with belts and "switches." Dkt. No. 131 at 60 (Appx. A, Exh. 6, Jefferson Decl.). Emma often slapped the Walker children in the mouth with an open hand. *Id.* at 60, 63. Jefferson also described the family's living arrangements. The Walker family regularly had friends and extended family living with them in their small homes and apartments. The children shared bedrooms, bunk beds, or sometimes slept in the living room. *Id.* at 63-64. Jefferson recalled that, at one point, six

adults and twenty-four children lived in the Walker home. *Id.* at 65.

Jefferson also noted the deaths of Ronald, Lena, and the Walker children's beloved grandmother, Mamun, and described the family's devastation over their deaths. Dkt. No. 131 at 67-68 (Appx. A, Exh. 6, Jefferson Decl.). The loss of Lena's children in a custody battle shortly after Lena's death also had "devastating and permanent" effects on the family. *Id.* at 69. The family, with the exception of Petitioner, began using drugs and alcohol to deal with its sense of pain. In addition, Jefferson echoed her siblings' sentiment that Ratliff was a bad influence on her brothers, that he tried to molest each of the sisters, and that he was a drug user. *Id.* at 70.

Jefferson's declaration included a list of potential penalty phase witnesses she would have given to defense counsel if he had asked for her help.

### 6. Marvin Pete Walker, Sr.

Marvin, Sr. is Petitioner's father. In his declaration, he summarized his own difficult childhood and early adulthood, as well as his history with Emma and the children. Dkt. No. 131 at 156-173 (Appx. A, Exh. 18, Marvin, Sr. Decl.). Marvin Sr. described the difficulty of dealing with Ronald's death while Petitioner was sick and being turned away from hospitals. *Id.* at 171. He also described Lena's murder, calling it "the worst thing that ever happened to [the] family." *Id.* at 172.

With respect to Petitioner, Marvin, Sr. stated that he "would have told the jury about [Petitioner's] childhood in Tulare, how hard [Petitioner] worked, how much [Petitioner] tried to please [Marvin, Sr.], how many hardships [Petitioner] had to overcome in his young life. . . [and] would have told them of the strength of [Petitioner's] character, and the reasons why [Marvin, Sr.] love[s] [Petitioner], and why [Petitioner] deserves to live." Dkt. No. 131 at 173 (Appx. A, Exh. 18, Marvin, Sr. Decl.).

### 7. Extended Family and Teachers

Petitioner also submitted thirteen declarations by members of his extended family and his teachers and counselors.

Members of Petitioner's extended family, including several of his cousins and one of his uncles, confirmed that Marvin, Sr. beat his children, with one cousin calling the beatings "brutal

abuse." Dkt. No. 131 at 106 (Appx. A, Exh. 10, Annette Marie Montgomery Decl.); *see id.* at 114 (Appx. A, Exh. 11, Derrick Palmer Decl.) (stating that the children were afraid of Marvin, Sr., who beat the children during family pinochle parties); *id.* at 119 (Appx. A, Exh. 12, Dwight Palmer Decl.) (stating that the children were afraid of Marvin, Sr. and that his beatings left the children with welts and sometimes drew blood); *id.* at 124 (Appx. A, Exh. 13, Darryl Preston Decl.) (calling Marvin, Sr. an "expert child whipper"); *id.* at 141 (Appx. A, Exh. 16, Rev. George Walker Decl.) (stating that Marvin, Sr. beat his children and sometimes raised "quite a welt" on the children's bodies). Several members of the family also supported the allegation that Marvin, Sr., along with other adults present in the household, taunted and insulted the children during Marvin, Sr.'s beatings. *See* Dkt. No. 131 at 21 (Appx. A, Exh. 3, Felicia L. Carter Decl.) (stating that Petitioner's father and the other adults "insulted and demeaned" the children during parties); *id.* at 93 (Appx. A, Exh. 8, Blanche Davis Martin Decl.) (stating that the adults "sexually taunted" Petitioner and the other children during beatings by Petitioner's father); *id.* at 104 (Appx. A, Exh. 10, Annette Marie Montgomery Decl.) (stating that the children became "objects to humiliate" during Petitioner's parents' pinochle parties). In addition, Petitioner's cousins and uncle all noted how difficult Ronald and Lena's deaths were on the family and confirmed that much of Petitioner's family turned to hard drugs to try to cope with the loss. Several members of the family also noted that special needs children were common in Petitioner's extended family. *See id.* at 142 (Appx. A, Exh. 16, Rev. George W. Walker) (stating that mental health issues were common in his family and noting his own special needs daughter); *id.* at 93 (Appx. A, Exh. 8, Blanche Davis Martin Decl.) (listing special needs children in Petitioner's extended family). Moreover, at least two of Petitioner's cousins stated their belief that Petitioner and the other males in the family of the same generation were molested by one or more adult males in the family. *See id.* at 93 (Appx. A, Exh. 8, Blanche Davis Martin Decl.); *id.* at 20 (Appx. A, Exh. 3, Felicia L. Carter Decl.).

Some of Petitioner's teachers and counselors noted in their declarations that Petitioner was trustworthy and followed directions during high school, although he had poor school attendance. Dkt. No. 131 at 7 (Appx. A, Exh. 1, Louis Baldock Decl.) (noting that Petitioner acted as teaching

assistant and that Petitioner displayed a "positive attitude and low-key personality"). According to one teacher, Petitioner was involved with the Black Student Union on his campus and participated in its discussions and projects, but was often quiet during class. Dkt. No. 131 at 13 (Appx. A., Exh. 2, William Boone Decl.). The teachers and counselors also noted that, at the time Petitioner was enrolled in school, black students were at a disadvantage and had little to no help. Dkt. No. 131 at 13 (Appx. A, Exh. 2, William Boone Decl.) (stating that "the average black student like [Petitioner] was twice diminished, first by being discouraged from joining into class discussion and activity, and then by being perceived as threatening because of his silence and non participation"); *id.* at 132 (Appx. A, Exh. 14, Robert Sweat Decl.) (stating that "[p]oor black students . . . seemed cheated out of human resources" due to their white teachers, who were "uninformed and motivated by fear and bias" against black students); *id.* at 135 (Appx. A, Exh. 15, Beatrice A. Thomas Decl.) (stating that "[f]or students like [Petitioner], who arrive from elementary school without having been taught the fundamentals, one can predict without a doubt that the student will certainly fail. . . [w]ithout the resources available for that intervention, [Petitioner's] fate was sealed"). They also acknowledged the Walker family's noticeable poverty and the appearance that Petitioner had taken over the role of the adult male in the household.

Each of Petitioner's relatives and Beatrice A. Thomas, one of Petitioner's school counselors, provided a list of witnesses they would have referred defense counsel to if he had asked for their help.

## III. DISCUSSION

### A. Standard of Review Under AEDPA

Pursuant to the Anti-terrorism and Effective Death Penalty Act (AEDPA), a district court may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In determining whether a petitioner is entitled to relief under

this provision, a federal court's review "is [generally] limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170 (2011).

The "contrary to" and "unreasonable application" prongs of § 2254(d)(1) have separate and distinct meanings. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court's decision is "contrary to" clearly established U.S. Supreme Court law if that decision fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id.* at 412–13. A decision is an "unreasonable application" of U.S. Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Importantly, "'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410). A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Holdings of the U.S. Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under section 2254(d)(1). *See Williams*, 529 U.S. at 412; *see also Lopez v. Smith*, — U.S. —, 135 S.Ct. 1, 4 (2014) (per curiam) ("AEDPA permits habeas relief only if a state court's decision is 'contrary to, or involved an unreasonable application of, clearly established Federal law' as determined by this Court, not by the courts of appeals"). While a federal court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam), "[c]ircuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Lopez*, 135 S.Ct. at 4 (internal quotation marks omitted).

To find, under § 2254(d)(2), that a state court's decision was based on "an unreasonable determination of the facts," a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is

supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted), cert. denied, — U.S. —, 135 S.Ct. 710 (2014). In other words, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (internal quotation marks omitted). That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), abrogated on other grounds in *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

Under AEDPA, a federal court reviews "the last reasoned state-court decision." *Castellanos v. Small*, 766 F.3d 1137, 1145 (9th Cir. 2014). In a case where "no state-court decision furnishes a basis for the state court's underlying reasoning," a federal court's "duty under AEDPA is not absolved." *Murray v. Schriro*, 745 F.3d at 996. Rather, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. To determine whether a petitioner has met this burden, a federal court must ask "what arguments or theories supported or, . . . could have supported, the state court's decision" and decide "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme Court]." *Id.* at 102. Thus, when a state court does not supply reasoning for its decision, a federal court "must engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable." *Castellanos*, 766 F.3d at 1145 (internal quotation marks omitted). Critically, independent review of the record "is not a de novo review of the constitutional question," but rather the only way a federal court can determine whether a silent state court decision is objectively unreasonable. *Murray*, 745 F.3d at 997.

In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's

decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's constitutional claim "de novo." *Hurles*, 752 F.3d at 778. If constitutional error is found, however, habeas relief is warranted only if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637.

**B.    Penalty Phase Ineffective Assistance of Counsel Claims**

The clearly established federal law applicable to this claim is set out in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the U.S. Supreme Court held that ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel. *Strickland*, 466 U.S. at 686. To prevail on an ineffective assistance of counsel claim, a petitioner must establish that: (1) his counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688-94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Ultimately, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances. *Id.* at 689 (internal quotation marks omitted). "In assessing adequacy of representation, '[the Court] is required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as he did.'" *Gallegos v. Ryan*, 820 F.3d 1013, 1030 (9th Cir. 2016) (citing *Pinholster*, 563 U.S. 170).

A "doubly" deferential standard of review is appropriate in analyzing ineffective assistance of counsel claims under AEDPA because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential." *Richter*, 562 U.S. at 105 (internal quotation marks omitted). When

section 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### 1. Claim 2A

Petitioner asserts in Claim 2A that defense counsel was ineffective at the penalty phase of trial. *See* Fed. Pet. at 28-35. Specifically, Petitioner argues defense counsel failed to investigate and introduce available vital evidence of Petitioner's childhood abuse and poverty, his mental deficiencies due to brain damage, and Petitioner's "educational, psychological, medical, institutional, cultural and social history and background. . . ." Pet. Br. at 28. Respondent concedes that at least some of defense counsel's conduct fell below an objective standard of reasonableness, but argues that Petitioner has failed to show prejudice. Resp. Br. at 27. Claim 2A was denied by the California Supreme Court in a summary opinion.

### a. Counsel's Failure to Investigate: Background Evidence

As noted, Petitioner points to several alleged deficiencies in counsel's performance during the penalty phase. First, Petitioner notes that defense counsel, who had not tried a capital case before appearing on Petitioner's case, had "no assistant, clerk, secretary or anyone else in the courtroom to help during trial." Fed. Pet. at 196. While not dispositive as to ineffectiveness, the Court agrees that counsel's inexperience and lack of help contextualize his subsequent failure to prepare for the penalty phase of trial.

Petitioner next points to defense counsel's failure to begin preparing for the penalty phase until after the guilt phase had already concluded, leaving counsel with only one day to prepare. RT 3099, 3115; Pet. Br. at 197. "[W]hen it comes to the penalty phase of a capital trial, 'it is imperative that all relevant mitigation information be unearthed for consideration.'" *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)). While defense counsel is not required to uncover every piece of mitigation under the sun, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690-91). In the past, the Supreme Court has held that a limited

United States District Court
Northern District of California

weeklong penalty phase investigation—seven times as long as counsel's investigation here—was deficient. *See Williams v. Taylor*, 529 U.S. 362, 395 (2000). Accordingly, the Court agrees that counsel's failure to give himself more than one day for penalty phase investigation cannot be characterized as a reasonable trial tactic.

Even assuming a reasonable investigation could have been conducted within one day, however, counsel appears to have conducted no meaningful investigation after the guilt phase concluded. Counsel failed to take any steps required for a cursory investigation, let alone an adequate one. For example, there is no evidence counsel hired an investigator to carry out any penalty phase investigation or otherwise interviewed Petitioner's family, teachers, counselors, psychiatrists, psychologists or anyone else who may have examined or spent significant time with him during his childhood or adulthood. *See* Dkt. 85 at 22 (cousin Felicia Carter); Dkt. 85 at 39 (sister Vernelle W. Harper); Dkt. 85 at 153 (brother Johnny K. Walker); Dkt. 85 at 88 (cousin John Lewis); Dkt. 85 at 96 (cousin Blanche D. Martin); Dkt. 85 at 111 (cousin Annette M. Montgomery); Dkt. 85 at 127 (cousin Darryl Preston); Dkt. 85 at 186 (sister Shirley A. Walker); Dkt. 85 at 15 (high school teacher William Boone); Dkt. 85 at 9 (high school teacher Louis Baldock); Dkt. 85 at 137 (high school counselor Beatrice A. Thomas). Each of Petitioner's proffered witnesses was willing to testify and it is clear that most, if not all, of Petitioner's proffered testimony in support of this claim would have been admissible and favorable to him. Counsel's failure to contact witnesses is even more egregious when considering that counsel appears to have ignored investigative leads provided to him by Petitioner's family: when Petitioner's mother and brother visited defense counsel in his office to offer him a list of potential witnesses who could testify on behalf of Petitioner, counsel rejected the list and told them he had everything he needed. Dkt. 133-1 at 94; Dkt. 133-2 at 1. Had counsel conducted even a cursory investigation, he would have undoubtedly encountered "the presence of certain elements in [Petitioner's] background, such as a family history of alcoholism, abuse, and emotional problems, [which would have] trigge[ed] a duty to conduct further inquiry." *Earp v. Ornoski*, 431 F.3d 1158, 1175-76 (9th Cir. 2005); s*ee Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (finding ineffective assistance where counsel did not prepare for the penalty phase in any

20

significant way despite the availability of strong mitigating evidence). Thus, Petitioner has shown counsel's near-total failure to investigate even after the guilt phase fell below reasonable professional standards.

Petitioner also argues defense counsel was ineffective in selecting and preparing the penalty phase witnesses he did present at Petitioner's penalty phase trial. According to Petitioner, defense counsel chose witnesses on the morning of the first day of the penalty phase by choosing from the members of Petitioner's friends and family who happened to be in attendance to watch the proceedings. Fed. Pet. at 29. Counsel also allegedly recruited his penalty phase witnesses without explaining the function of the penalty phase, the purpose of their testimony, or the range of permissible evidence. *Id.* The record supports these assertions and Respondent concedes that defense counsel's conduct in doing so was constitutionally ineffective.

The Court once again agrees with the parties. "[T]he failure to prepare a witness adequately can render a penalty phase presentation deficient." *Hamilton v. Ayers*, 583 F.3d 1100, 1121 (9th Cir. 2009); *see also Williams v. Filson*, 908 F.3d 546, 566 (9th Cir. 2018) (finding counsel ineffective when he "failed not only to elicit relevant information, but also to prepare the family members and friends who testified at the sentencing hearing"). Petitioner's proffered evidence shows that counsel "prepared" his penalty phase witnesses only by telling them to plead for Petitioner's life and try to cry, if possible. *See* Dkt. 131 at 71 (Petitioner's sister, Jefferson, stating that "[i]n the few minutes that [Petitioner's] lawyer spent with me before I took the witness stand, he told me to beg for my brother's life and to cry if I could"); *see* Dkt. 131 at 56 (Petitioner's sister Marlene, stating that "[a] few minutes before [Petitioner's] penalty trial began, his lawyer took my mother, my sister [Jefferson], [Petitioner's] girlfriend Denise Jackson, and me into the corridor of the courthouse next to the elevators. . . . Without explaining anything, he told us that he was going to call us to the witness stand to plead for [Petitioner's] life. He never asked us anything about [Petitioner] and our family. . . . Before that meeting, [Petitioner's] attorney had never spoken to me"). Counsel did not interview each witness to determine potential penalty phase questions, explain the mitigating factors, or identify the permissible scope of evidence at the penalty phase. Given the undisputed evidence that Petitioner's penalty phase witnesses were

willing to testify to substantial classic mitigating evidence,[4] the Court can find no reasonable strategic basis for counsel's failure to prepare his penalty phase witnesses.

In addition, counsel's examination of his penalty phase witnesses similarly fell below reasonable professional standards. Without the benefit of a reasonable investigation, counsel could not develop a reasonable strategy for the penalty phase. *Correll v. Ryan*, 539 F.3d at 949 ("An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all"). Counsel's failure to elicit the substantial mitigating evidence despite its availability from several of his penalty phase witnesses has no reasonable strategic basis.

Based on the various deficiencies described above, the Court concludes Petitioner has shown counsel's penalty phase investigation and presentation regarding Petitioner's background fell below an objective standard of reasonableness. *See Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005) (finding of ineffective assistance of counsel where counsel failed to discover and present evidence that defendant was raised in a slum, was physically abused by his parents and witnessed his father's abuse of his mother, did not complete his high school education, had no indoor plumbing, and had mental health issues); *Williams*, 529 U.S. at 369, 370 (finding of ineffective assistance of counsel where counsel failed to investigate and present evidence that defendant had been abused and neglected during his childhood, and that he was "'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin"); *Karis v. Calderon*, 283 F.3d 1117, 1139 (9th Cir. 2002) (finding of ineffective assistance of counsel where counsel failed to present evidence of defendant's frequent "vicious[] beat[ings]" by stepfather and mother).

### b. Counsel's Failure to Investigate: Mental Health Evidence

Additionally, Petitioner argues counsel was ineffective in failing to consult with mental health experts regarding Petitioner's psychological and medical history despite Petitioner's brain damage. *See* Fed. Pet. at 29. Respondent argues that while Petitioner's mental health issues may have been obvious to Dr. Pettis during his examination of Petitioner, "[i]t does not follow . . . that

---

[4] The Court will examine the proffered evidence in more detail when it considers whether Petitioner has shown prejudice.

United States District Court
Northern District of California

diagnoses made upon 1997 testing on a death row inmate . . . would have been obvious 18 years earlier." *See* Resp. Br. at 29.

"[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v. Calderon*, 70 F.3d at 1043.

According to Petitioner's proffered evidence, Petitioner suffered from brain damage, which affected Petitioner's "cognitive functioning." *See* Dkt. No. 130-1 (Exh. J, Dr. Pettis Decl.). According to Petitioner, the brain damage was "evident in [his] 'speech impediment, and his behavior.' . . . [and] alone should have put [defense counsel] on notice to investigate [Petitioner's] cognitive functioning." Pet. Reply Br. at 6. As noted, Petitioner has also submitted evidence that he was subjected to serious emotional and physical abuse throughout his life and "had learning disabilities," *see* Dkt. No. 130-1 at 166 (Exh. J, Dr. Pettis Decl.). It appears that, had counsel conducted a competent investigation, these factors may have led counsel to engage mental health experts to examine the source of Petitioner's educational difficulties and the psychological effects of Petitioner's abuse. However, while Dr. Pettis and Dr. Watson described Petitioner's mental impediments as "long-standing," *see* Dkt. No. 130-1 (Exh. J, Dr. Pettis Decl.) at 165, *id*. at 60 (Exh. I, Dr. Watson Decl.), Petitioner does not point to anything in the trial record or in counsel's possession that would have certainly placed counsel on notice that Petitioner had any mental impairment. Petitioner has therefore not shown the state court's denial of this portion of his claim was objectively unreasonable. *See Richter*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard"); 28 U.S.C. § 2254(d).

### c. Prejudice

The Court now turns to the issue of prejudice. As noted, to establish prejudice, Petitioner must demonstrate a reasonable probability that, but for defense counsel's deficiency, he would not have been sentenced to death. *See Wiggins*, 539 U.S. at 534-538. "In assessing prejudice, [the

23

Court must] reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id*. at 534.

Respondent argues that Petitioner has not shown the state court's denial of his claim was unreasonable for purposes of § 2254(d) because the aggravating evidence was "overwhelming," *People v. Walker*, 47 Cal.3d at 640, and the state court reasonably could have concluded there was no reasonable probability that the proffered evidence would have influenced the jury's death verdict. Resp. Br. at 30-31. Specifically, Respondent points to the evidence that Petitioner "murder[ed] one person and assault[ed] two others in execution-style shootings of unarmed and unresisting victims, two of whom were teenagers. One month later [Petitioner] viciously pistol-whipped a young woman and shot her twice in the head in order to facilitate his escape with her $11 and her car." Resp. Br. at 31 (quoting *People v. Walker*, 47 Cal.3d at 640). Respondent also points to the threats allegedly made by Petitioner against MacIvor and a deputy district attorney .

The Court first notes that the California Supreme Court noted the "overwhelming" nature of the aggravating evidence before it had the opportunity to consider Petitioner's proffered mitigating evidence. In comparison to the evidence offered by counsel on Petitioner's behalf during the penalty phase—which "consisted of the fact that he was [nineteen] years old at the time of the offenses, had no prior criminal record, had done yard work for a church secretary in the past, gave a friend rides to work, provided financial and emotional support to his mother and sister, and was loved by them and his girlfriend," *Walker v. Martel*, 709 F.3d 925, 931 (9th Cir. 2013), the aggravating evidence was indeed "overwhelming." However, Petitioner has since proffered substantial mitigating evidence and the state court's previous finding is no longer relevant.

Next, Respondent argues that Petitioner's case is analogous to *Woodford v. Visciotti*, 537 U.S. 19 (2002). In *Visciotti*, the prosecution presented evidence, during the penalty phase, that petitioner Visciotti, who had been convicted of a "cold-blooded execution-style killing of one victim and attempted execution-style killing of another, both during the course of a preplanned armed robbery," *id.* at 26, had previously stabbed a man and "a pregnant woman as she lay in bed trying to protect her unborn baby." *Id*. On federal habeas, Visciotti claimed that counsel was

ineffective in failing to investigate and discover evidence that he was born with club feet and that he was berated, lacking in self-esteem, frequently moving as a child, and potentially suffered from a seizure disorder. *Id.* The Supreme Court found that the aggravating evidence was "devastating" in comparison to Visciotti's mitigating evidence. Based on AEDPA deference, the Court held that Petitioner failed to show the state court's conclusion that Petitioner was not prejudiced by counsel's deficient conduct was unreasonable. *Id.*

While the underlying offenses in *Visciotti* are similar to the offenses in Petitioner's case, however, the proffered mitigating evidence in each case is significantly different. In *Visciotti*, the Supreme Court emphasized the relative weakness of the proffered mitigating evidence. In contrast, Petitioner's proffered evidence cannot reasonably be characterized as weak. Petitioner endured not only being berated by his family, moving frequently, and lacking in self-esteem at school—the three mitigating circumstances identified by the Supreme Court in *Visciotti*—but also, as will be discussed in more detail below, suffered from extreme poverty, hunger, violence, family deaths, and other serious hardships.

*Williams v. Taylor*, 529 U.S. 362 (2000), is instructive.[5] In *Williams*, the Supreme Court held that petitioner Williams, who had been convicted of robbery and capital murder, was prejudiced by his attorney's ineffective conduct during the penalty phase. Williams' attorney did not begin preparing for the penalty phase until a week before the trial and "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood." *Id.* at 395. During his state habeas proceedings, Williams proffered evidence that he was severely and repeatedly beaten by his father, that his parents were imprisoned, and that he was subsequently placed in an abusive foster home. His attorney also failed to uncover evidence of Williams' borderline mental retardation and prison records reflecting favorably on the defendant's conduct while incarcerated.

Like Respondent argues in the case at hand, the state in *Williams* argued that Williams

---

[5] While the Supreme Court in *Williams* did not apply AEDPA deference in making its ruling, *Williams* was clearly established Supreme Court precedent for purposes of *Strickland* analysis as to prejudice at the time the California Supreme Court denied Petitioner's claim on state habeas in 2004.

failed to show prejudice because the evidence would not rebut or outweigh the facts of the case or Williams' lengthy history of violence and crime. The prosecution had introduced Williams' prior convictions for armed robbery, burglary, and grand larceny and presented evidence that Williams had confessed to two auto thefts and two separate violent assaults on elderly victims. In one assault, Williams started a fire outside an elderly man's house before attacking and robbing him. In the other, Williams brutally attacked an elderly woman, leaving her in a vegetative state. Finally, Williams started a fire in the jail while he was being held for trial. *Williams*, 529 U.S. at 368-69. Despite the considerable aggravating evidence, the Supreme Court rejected the state's contention that Williams did not show prejudice and found that the compelling mitigating evidence may have influenced the jury's appraisal of the defendant's moral culpability "even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 398. Given the compelling nature of the mitigating evidence, the Court concluded that Williams had been prejudiced by his attorney's deficient conduct. *Id.*

Petitioner's case is analogous to *Williams*. Here, Petitioner has submitted considerable mitigating evidence, including evidence comparable to that which was found compelling by the Supreme Court. For example, Petitioner attended school in visibly-worn clothing, was visibly malnourished, and wore shoes so worn down that his feet were visible through holes in his soles. Petitioner witnessed Marvin, Sr.'s beatings of Emma and was himself regularly beaten by Marvin, Sr., who used belts and cords and sometimes drew blood. The ritualized beatings by Marvin, Sr. often involved psychological abuse as well. Petitioner and his siblings were "whipped" more if they cried, tried to protect their bottoms, or tried to defend each other. When other adults were present during the beatings, they taunted and made fun of the children as the beatings were carried out. In addition, Petitioner was beaten by Emma, who suffered from severe mood swings, with her hand or a metal pipe. Despite the potential consequences of doing so, Petitioner often tried to stop Marvin, Sr. from beating Emma and the children. Petitioner was often singled out for beatings by Marvin, Sr. for disobeying his rule that the children were not allowed to take peaches from the yard's peach tree or cook any fish from Marvin, Sr.'s freezer, but Petitioner continued to feed his siblings the food.

United States District Court
Northern District of California

Petitioner's childhood also involved severe illness and traumatic family deaths. For example, Petitioner survived meningitis at a young age after he and his younger sibling, Donald, contracted the disease. Petitioner went into a coma and, upon waking several days later, was informed that Donald did not survive. Marvin, Sr. left the family shortly thereafter, forcing Petitioner, who was then a young child, to take over the role of "protecting" his family. A few years later, Petitioner witnessed the gruesome scene of the murder of his sister, Lena, after her estranged husband stabbed her and left her to die, naked and bleeding, at a neighbor's door. Lena's death, in turn, led Petitioner's mother and siblings to begin abusing alcohol and other drugs while Petitioner, who was only twelve years old, tried to remain "strong," Pet. Br. at 71. Petitioner tried to help his family, eventually dropping out of school to work and support them.

Following Ratliff's arrival in the Walker home, Petitioner also became a protector for his sisters against Ratliff's sexual abuse. Two of Petitioner's sisters moved to an apartment in a dangerous part of town, and Petitioner eventually moved in with them in order to take care of them. Another sister attempted suicide after she accused Ratliff of sexual abuse and Emma accused her of lying. Ratliff also had a negative effect on the Walker brothers. Ratliff used Petitioner and his brothers during his scams and, according to several of Petitioner's proffered witnesses, taught the children how to be criminals. Ratliff was also a drug user. Despite the turmoil in Petitioner's family life, Petitioner's attempts to care for his family continued into Petitioner's young adulthood. As noted by his family members during their penalty phase testimony, Petitioner often lent them money. Shortly before the crimes, Petitioner's family did not have food to eat. Petitioner took an expedition to Tulare, California, to fish for food, bringing back several bags of fish for them.

Finally, while Petitioner has not met his burden pursuant to § 2254(d) of showing that the state court could not reasonably conclude that counsel did not have adequate notice of Petitioner's brain damage and mental impairments, there is at least some evidence that, had counsel conducted a reasonable investigation, he would have discovered that Petitioner suffered from "long-standing" brain damage which affected Petitioner's "cognitive functioning." *See* Dkt. No. 130-1 (Exh. J, Dr. Pettis Decl.). Petitioner's proffered mental health evidence also shows that the systematic

ritualized beatings by Petitioner's father, "which at times constituted torture, affected every aspect of his development and life, including brain function, emotional responses, perception of the world around him, beliefs about himself, sense of personal integrity, and relationships with others." *Id.* at 175.

Accordingly, Petitioner's proffered mitigating evidence was at least as considerable and compelling, if not more, as the proffered evidence in *Williams*. Had counsel performed an adequate investigation, the proffered evidence would have given the jury insight into Petitioner's "nightmarish childhood," *Williams*, 529 U.S. at 395, the various tragedies which plagued Petitioner and his family throughout his youth and into his early adulthood, and Petitioner's devotion to his family. "'[C]ounsel's duty is not discharged merely by presenting some limited evidence. Rather, a penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.'" *Hamilton v. Ayers*, 583 F.3d 1100, 1135-36 (9th Cir. 2009). The evidence introduced during Petitioner's penalty phase of trial, summarized by the Ninth Circuit as consisting of "the fact that he was [nineteen] years old at the time of the offenses, had no prior criminal record, had done yard work for a church secretary in the past, gave a friend rides to work, provided financial and emotional support to his mother and sister, and was loved by them and his girlfriend," *Walker v. Martel*, 709 F.3d 925, 931, simply did not compare in quality and quantity to Petitioner's proffered evidence. Moreover, counsel's failure to adequately prepare for the penalty phase left jurors with the impression that, apart from living in poverty, Petitioner's childhood was ordinary and supportive, an impression that Petitioner's proffered evidence shows to be markedly false. But for counsel's ineffectiveness, the jurors "would have learned that [Petitioner] had precisely 'the kind of troubled history [the Supreme Court] has[s] declared relevant to assessing a defendant's moral culpability." *Williams v. Filson*, 908 F.3d at 569 (quoting *Wiggins*, 539 U.S. at 535).

The proffered evidence would have also allowed counsel to more effectively emphasize the importance of Petitioner's youth as a statutorily-defined mitigating factor. As noted by the Supreme Court in *Roper v. Simmons*, "[t]he reality that juveniles still struggle to define their

28

identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Roper v. Simmons*, 543 U.S. 551, 570 (2005). Petitioner was only nineteen years old at the time of the crimes and by then had "witness[ed] and survive[d] overwhelming events that are outside the range of normal human experiences." Dkt. No. 130-1 (Exh. J, Dr. Pettis Decl.) at 139. Thus, even if the proffered evidence would not necessarily rebut the aggravating nature of Petitioner's crimes, the proffered evidence would have provided the jury with a different understanding of Petitioner's life and character. Such a deepened understanding may well have influenced at least one juror's appraisal of Petitioner's moral culpability. *See Williams*, 529 U.S. at 398; *see also Wiggins*, 539 U.S. at 538.

Respondent also argues Petitioner has not shown prejudice because some of Petitioner's proffered evidence would have opened the door to other unfavorable evidence. For example, Respondent argues the proffered testimony by Jefferson—who testified at Petitioner's penalty phase—would have opened the door to the introduction of Jefferson's statements to an investigator that Petitioner told her about his sex life, burglaries, and that he had once been charged with rape. Respondent makes similar arguments regarding evidence that Ratliff was in Petitioner's car during Petitioner's sale of the gun used in the crimes and notes that Petitioner's proffered evidence regarding his kindness to special needs children would have been double-edged because Vasquez, the only victim who died during the commission of the underlying crimes, also had special needs. Respondent's argument is unpersuasive. Even if some of the proffered evidence could have been interpreted in a negative light, the bulk of the evidence would have been favorable to Petitioner and would have significantly strengthened Petitioner's penalty phase presentation. Moreover, given the substantial nature of Petitioner's proffered evidence, the Court concludes Respondent has simply not shown that the aggravating evidence was so considerable that a death penalty verdict was inevitable.

Based on the aforementioned, the Court concludes that counsel's failure to investigate Petitioner's background and failure to prepare the few witnesses he presented during the penalty phase amounted to deeply ineffective assistance of counsel. Counsel's near-total failure to investigate and prepare for the penalty phase deprived Petitioner of a fair penalty phase trial whose

result was reliable. *Strickland*, 466 U.S. at 687. Moreover, "[t]he [state court's] decision that [Petitioner] was not prejudiced by his counsel's failure to conduct a thorough—or even cursory—investigation is unreasonable. The . . . [c]ourt either did not consider or unreasonably discounted the [proffered] mitigation evidence." *Porter v. McCollum*, 558 U.S. 30, 42 (2009); *see Strickland*, 466 U.S. at 687. Petitioner has met his burden pursuant to § 2254(d).

Accordingly, Claim 2A[6] will be **PARTIALLY GRANTED**.

### 2. Ineffective Assistance of Counsel Claim 2E

In Claim 2E, Petitioner argues counsel was constitutionally ineffective when he conducted a "rambling and unfocused" direct examination of Petitioner during the penalty phase of his trial. *See* Fed. Pet. at 33. Specifically, Petitioner argues counsel was ineffective because he failed to elicit testimony about Petitioner's childhood, his family's poverty, and other mitigating evidence that would have placed Petitioner's crimes into context. Pet. Br. at 60. Petitioner also faults counsel for eliciting a statement from Petitioner that he had been unjustly convicted. Fed. Pet. at 33. Respondent argues Petitioner has not shown counsel's examination was ineffective or that Petitioner was prejudiced. Resp. Br. at 15-16.

To the extent Petitioner's proffered evidence shows that counsel examined Petitioner without having conducted any background investigation or preparing an informed penalty phase strategy, Petitioner has shown that counsel's conduct fell below reasonable standards of competence. "An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll v. Ryan*, 539 F.3d at 949; *see Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"). Petitioner has also shown

---

[6] Petitioner argues the Court must also consider Claim 2B, that counsel was ineffective in failing to object to the prosecution's introduction of the alleged threats made by Petitioner against MacIvor and a deputy district attorney, insofar as counsel's failure to investigate the aggravating evidence affected Petitioner's penalty phase presentation. Pet. Br. at 61. The Court denied Claim 2B on February 2, 2010, after finding that Petitioner had not shown prejudice as a result of the admission of the aggravating evidence. Dkt. No. 189 at 9-11. As such, even assuming arguendo that counsel was ineffective in failing to investigate the circumstances of the alleged threats, Petitioner has not shown counsel's failure to specifically rebut the aggravating evidence was prejudicial.

prejudice. As noted in the preceding section, defense counsel's failure to perform any meaningful penalty phase investigation led to counsel's failure to discover compelling mitigating evidence about Petitioner's "nightmarish childhood," his family's extreme hardships, and his devotion to caring for his family. Counsel's failure to ask Petitioner any questions about his life therefore deprived Petitioner of the opportunity to introduce evidence that "might have influenced the jury's appraisal" of his culpability. *See Williams v. Taylor*, 529 U.S. at 398. Given counsel's undisputed egregious failure to conduct any meaningful penalty phase preparation and the substantial mitigating evidence available at the time of Petitioner's trial, the state court's denial of this portion of Petitioner's claim was contrary to and an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *see also Strickland*, 466 U.S. at 687; *Wiggins*, 539 U.S. at 538. Accordingly, the above-identified portion of Claim 2E will be **GRANTED**.

To the extent Petitioner argues that counsel's examination of Petitioner was deficient because it led to Petitioner's testimony that he was unjustly convicted, the Court concludes Petitioner has not shown the state court's denial of that portion of his claim was unreasonable. Petitioner's testimony allowed him to plead for his own life and tell the jury that he wanted to live, RT 3249-50, and Petitioner's proclamation that he was unjustly convicted was consistent with Petitioner's insistence that he did not commit the crimes. In sum, reasonable minds could differ as to whether Petitioner has shown he was prejudiced by counsel's deficient direct examination insofar as it led to Petitioner's testimony that he was unjustly convicted. *See Richter*, 562 U.S. at 101; 28 U.S.C. § 2254(d). This portion of Claim 2E will be **DENIED**.

### 3. Ineffective Assistance of Counsel Claim 2F

In Claim 2F, Petitioner argues that counsel was constitutionally ineffective when he "delivered a rambling and unfocused penalty summation," pointing to various alleged errors. *See* Fed. Pet. at 33. The California Supreme Court denied this claim in a summary opinion.

The right to effective assistance of counsel extends to closing arguments. *See Bell v. Cone*, 535 U.S. 685 (2002). Counsel, however, has wide latitude in deciding how to represent a client, and "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*,

31

540 U.S. 1, 6 (2003). A reviewing court must therefore observe high deference during review of an attorney's closing argument, and doubly so when review is conducted through the lens of AEDPA. *Id.*

Petitioner first argues that counsel was ineffective when he "repeatedly told the jury that the law was against [Petitioner] on the critical question of balancing aggravating and mitigating factors." Pet. Br. at 42-43, 63. Specifically, Petitioner contends that counsel misstated the law as to the application and role of aggravating and mitigating factors when he told the jury that "if you find that you've got one, two, three, four, five, six, seven, eight on the death penalty, then they automatically throw away life imprisonment without possibility of parole and give [Petitioner] the death sentence." RT at 3316-17. Respondent does not dispute that counsel misstated the law but asserts the state court reasonably could have concluded that there was no prejudice because it was unlikely that the jurors interpreted counsel's statements as concessions. Resp. Br. at 19-20. The Court agrees with the parties that there was no reasonable strategic basis to counsel's outright misstatements of the law. *See People v. Walker*, 47 Cal.3d at 643 (noting that "weighing" of the aggravating and mitigating factors should not reflect a mechanical counting of factors on each side because jurors may assign whatever moral or sympathetic value to each factor). The Court will consider Respondent's contention that Petitioner has not shown prejudice in conjunction with the other errors alleged within Claim 2F.

Petitioner also argues that counsel was ineffective when counsel suggested there were numerous rationales to impose the death penalty, including that the death penalty would prevent Petitioner from killing again, would be the "popular" thing to do, and would satisfy the jury's sense of vengeance. Pet. Br. at 45-46. Respondent argues the record clearly shows that counsel was arguing against the jury's reliance on the three rationales. Resp. Br. at 21. The Court has reviewed the record and agrees with Respondent that it appears counsel was attempting to persuade the jury against relying on future killings, popularity, or vengeance to impose the death penalty, telling the jurors that Petitioner was "a human being, that he has done things to help others, that he has been worthwhile in his activities, [and] that he is a person of worth." RT 3290-91. While counsel's delivery was not ideal, given the considerable deference to counsel's strategic

decisions mandated by *Strickland* and AEDPA, the Court concludes Petitioner has not shown no

reasonable jurist could find that counsel's conduct fell "within the wide range of reasonable

professional assistance" and "might be considered sound trial strategy" under the circumstances.

*Strickland*, 466 U.S. at 689.

Petitioner further argues counsel was ineffective when he disclaimed the existence of

powerful mitigating evidence during his closing argument. Specifically, Petitioner points to a

series of statements by counsel, including his statement that Petitioner's crimes were "cruel,

they're vicious acts [and] . . . were unjustified," RT 3287; that Petitioner "ha[d]n't done anything

in his life" because he did not maintain employment, his family was on welfare, he glared at

people, and had not done anything "worthwhile," RT 3317; and that the jury may have expected

Petitioner's family to testify that Petitioner had done "all kinds of good for people" or that

Petitioner was "a saint," but Petitioner was "not a saint." RT 3318; *see* Pet. Br. at 43-44.

Respondent asserts that counsel's statements indicate that he was attempting to "maintain the trust

of the jury, and such an attempt does not fall below professional norms." Resp. Br. at 20 (citing

*Florida v. Nixon*, 543 U.S. 175, 192 (2004) and *Hoffner v. Bradshaw*, 622 F. 3d 487, 501-03 (6th

Cir. 2010)). Some courts, including the Supreme Court, have upheld guilt and penalty judgments

in which defense counsel, during closing arguments, recognized the horror of the crimes or

referred to a defendant in less-than-positive terms during closing argument. *See Hoffner, 622 F.3d

at 501; see also Smith v. Spisak, 558 U.S. 139 (2010); see Florida v. Nixon*, 543 U.S. at 192.

Here, Petitioner had just been found guilty of the execution-style shootings of three individuals,

including the murder of Vasquez, and counsel may reasonably have determined that he needed to

build rapport with the jury in an effort to save Petitioner. Accordingly, given the considerable

deference to counsel's strategic decisions mandated by *Strickland* and AEDPA, Petitioner has not

shown that no reasonable jurist could find that counsel's challenged conduct was reasonable under

the circumstances. *See Strickland*, 466 U.S. at 689.

In addition, Petitioner argues the aforementioned statements by counsel collectively

formed a constitutionally-ineffective closing argument. Pet. Reply Br. at 67-68. Respondent

contends that counsel's argument, while not the most articulate, reflected reasonable strategic

33

considerations, such as a desire to focus on his argument that the jury should not use the alleged pretrial threats against the prosecutor and MacIvor in aggravation and on his general plea for mercy. Resp. Br. at 17-18. Again, based on the evidence introduced during trial and the penalty phase, the Court finds that counsel's overall argument—not including the misstatements of the law identified above— appeared to reflect reasonable strategic considerations. For example, counsel attempted to discredit the prosecution's allegations that Petitioner threatened MacIvor and a deputy district attorney by noting that the tape recordings related to the alleged threats to MacIvor had been destroyed and that neither incident had been taken seriously enough by law enforcement to file a police report on the incident. RT 3293. To the extent Petitioner challenges counsel's argument based only on the evidence presented during his trial and penalty phase proceedings, the Court concludes Petitioner has failed to show no reasonable jurist could find that counsel's conduct was reasonable under the circumstances. *See Strickland*, 466 U.S. at 689.

Accordingly, the above-mentioned portions of Claim 2F will be **DENIED**.

The Court must also consider, however, whether counsel's failure to prepare for the penalty phase affected counsel's closing argument. Pet. Reply Br. at 8. To the extent Petitioner argues that counsel's penalty phase arguments were ineffective because counsel failed to reasonably prepare for his penalty phase presentation, the Court concludes that counsel's decisions during penalty phase closing arguments, which were ultimately a result of counsel's undisputed failure to uncover and present any of the available and compelling mitigating evidence, fell below objective standards of reasonableness. As noted, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see Correll v. Ryan*, 539 F.3d at 949 ("An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all"). Counsel's conduct reflected a near-complete failure to conduct *any* investigation, let alone a reasonable one.

The Court also concludes that Petitioner has shown he was prejudiced by counsel's failure to argue the available mitigating evidence during penalty phase. As noted in the Court's discussion of Claim 2A, counsel's deficiencies left the jury with an inaccurate portrait of

34

Petitioner's life as fairly ordinary and, further, deprived the jury of seeing Petitioner's deep devotion to his family despite the horrors of his life. Had counsel introduced evidence of Petitioner's "nightmarish childhood," *Williams*, 529 U.S. at 395, and referred to the compelling mitigating evidence in his closing argument, the Court has no doubt there was a "reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. In addition, counsel's misstatement of the role and application of the aggravating and mitigating factors compounded counsel's failure to introduce any meaningful mitigating evidence on Petitioner's behalf. Even if the jurors did not take counsel's statements as "concessions," counsel's misstatement highlighted counsel's view that there were various aggravating factors in Petitioner's case while wholly failing to present a compelling case in mitigation. Taken as a whole, a competent closing argument incorporating the proffered mitigating evidence "'might well have influenced the jury's appraisal' of [Petitioner's] culpability." *Wiggins*, 539 U.S. at 538.

Accordingly, Petitioner has shown the California Supreme Court's denial of Claim 2F, insofar as Petitioner alleges ineffective assistance during closing arguments as a result of counsel's misstatements and failure to perform a reasonable mitigation investigation, was contrary to and an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *see also Strickland*, 466 U.S. at 687; *Wiggins*, 539 U.S. at 538. This portion of Claim 2F will be **GRANTED**.

### C. Procedurally Defaulted Claims

On October 14, 2005, the Court dismissed six of Petitioner's claims as procedurally defaulted. *See* Dkt. No. 147 at 11-12. The Court now considers whether Petitioner has established cause and prejudice for each claim's procedural default.

#### 1. Standard of Review

The United States Supreme Court has erected various barriers to the federal judiciary's review of the merits of claims that state prisoners previously presented to the federal courts for resolution, failed to raise in their first federal habeas petitions, or failed properly to present to the state courts. Unless a habeas petitioner shows cause and prejudice, therefore, a court may not reach the merits of procedurally defaulted claims in which the petitioner failed to follow

applicable state procedural rules in raising the claims. *See Sawyer v. Whitley*, 505 U.S. 333, 338 (1992) (citations omitted); *Farmer v. McDaniel*, 98 F.3d 1548, 1560 (9th Cir. 1996).

The cause standard requires the petitioner to show that "'some objective factor external to the defense impeded counsel's efforts'" to construct or raise the claim. *McClesky v. Zant*, 499 U.S. 467, 493 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A petitioner may show cause by establishing constitutionally ineffective assistance of counsel. *See McCleskey*, 499 U.S. at 494; *Carrier*, 477 U.S. at 486-88. To serve as "cause," however, the claim of ineffective assistance of counsel must have been presented as an independent claim to the state courts. *See Murray v. Carrier*, 477 U.S. 478, 489 (1986). A procedurally defaulted ineffective assistance of counsel claim is not cause to excuse the default of another habeas claim unless the petitioner can satisfy the cause and prejudice standard with respect to the ineffective assistance of counsel claim itself. *See Edwards v. Carpenter*, 529 U.S. 446, 451-51 (2002); *Cockett v. Ray*, 333 F.3d 938, 943 (9th Cir. 2003).

To establish good cause on the ground of ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *Loveland v. Hatcher*, 231 F.3d 640, 644 (9th Cir. 2000) (quoting *Strickland*, 466 U.S. at 687). Counsel's ineffectiveness must be reviewed "de novo." *Visciotti v. Martel*, 862 F.3d 749, 769 (9th Cir. 2016). Petitioner also must show actual prejudice resulting from the errors of which he complains. *See McCleskey*, 499 U.S. at 494; *United States v. Frady*, 456 U.S. 152, 168 (1982). Petitioner bears the burden of showing, not merely that errors at his trial created a possibility of prejudice, but that they "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. To ascertain the level to which such errors taint the constitutional sufficiency of the trial, they must be evaluated in the total context of the events at trial. *See Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir. 1997) (citing *Frady*, 456 U.S. at 169).

### 2. Claims 16, 19B(e), 19B(f), 19B(aa), & 19B(cc)

In Claim 16, Petitioner argued it was unconstitutional for a penalty phase jury to consider

the failure to express remorse by a defendant who maintains his innocence. *See* Fed. Pet. at 90. Specifically, Petitioner argues that the penalty phase jury's consideration of his lack of remorse, following an argument to that effect by the prosecutor during penalty phase closing argument, resulted in a death sentence obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. *See* Fed. Pet. at 90. Petitioner also challenged the prosecutor's argument, that Petitioner's failure to express remorse was an aggravating factor, in Claim 19B(f). *See* Fed. Pet. at 97.

Petitioner alleged three other procedurally defaulted instances of prosecutorial misconduct during penalty phase closing argument. In Claim 19B(e), Petitioner argued the prosecutor committed misconduct when he told the jury that the absence of mitigating factors should be considered in aggravation. *See* Fed. Pet. at 97. In Claim 19B(aa), Petitioner averred the prosecutor committed misconduct when he made an unsolicited comment about the California Supreme Court's "liberal" leaning. *See* Fed. Pet. at 97. Finally, in Claim 19B(cc), Petitioner argued the prosecutor committed misconduct when he expressed his personal opinion that Petitioner should be sentenced to death. *See* Fed. Pet. at 97.

Petitioner argues he has shown cause and prejudice as to each claim because counsel's failure to object to each error amounted to ineffective assistance of counsel. Pet. Br. at 78; *see Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991) ("Attorney error that constitutes ineffective assistance of counsel is cause" for procedural default). Respondent disagrees and further argues that Petitioner is not entitled to assert his claims of ineffective assistance of counsel as "cause" for his default because he never presented them as independent claims during his state habeas proceedings. Resp. Br. at 40.

Consequently, the Court must consider, as a threshold matter, whether Petitioner's claims of ineffective assistance of counsel for failure to object are themselves procedurally defaulted and therefore not suitable to serve as "cause" for purposes of excusing Petitioner's default. As noted, to serve as cause for a procedurally defaulted claim, a claim of ineffective assistance of counsel must have been presented as an independent claim to the state courts. *Murray v. Carrier*, 477 U.S. at 489. Petitioner does not dispute that he did not raise independent ineffective assistance of

counsel claims for counsel's failure to object to the various errors asserted in his procedurally defaulted claims. Instead, Petitioner argues the state court was nevertheless able to consider counsel's conduct when it considered Petitioner's claims of prosecutorial misconduct on appeal. *See* Reply Br. at 24.

Review of the state court's opinion on direct appeal quickly contradicts Petitioner's argument. The state court mentions counsel's conduct only to note that counsel failed to object, but does not otherwise consider counsel's performance. *See People v. Walker*, 47 Cal.3d at 630, 643-45, & 650-51. Moreover, where a petitioner has presented a claim "in such a manner that the state court could not, consistent with its own procedural rules, have entertained it . . . it could hardly be said that, as comity and federalism require, the State had been given a '*fair* "opportunity to pass upon [his claim]."'" *Edwards v. Carpenter*, 529 U.S. at 453 (citations omitted). Because the ineffective assistance of counsel claims are unexhausted, they may not form the basis of Petitioner's assertion of "cause" for procedural default as to Claims 16, 19B(e), 19B(f), 19B(aa), or 19B(cc).

Accordingly, as Petitioner has not shown cause for his procedural default nor demonstrated that his case satisfies another exception to procedural default, *see Coleman*, 501 U.S. at 750, Claims 16, 19B(e), 19B(f), 19B(aa), and 19B(cc) are not reviewable in this Court. The claims will remain **DISMISSED**.[7]

### 3. Guilt Phase Sufficiency of Evidence: Claim 21

In Claim 21, Petitioner argues his conviction and sentence were obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution insofar as the jury found that Petitioner personally used a dangerous and deadly weapon, for which the evidence was insufficient to support such a finding beyond a reasonable doubt. *See* Fed. Pet. at 101. The California Supreme Court denied this claim on the merits and on procedural grounds after

---

[7] To the extent Petitioner asserts he should be allowed to return to state court to exhaust his claims of ineffective assistance of counsel for failure to object to the errors alleged in Claims 16, 19B(e), 19B(f), 19B(aa), and 19B(cc), *see* Pet. Reply Br. at 25, Petitioner's request is **DENIED**. Petitioner failed to allege cause, potential merit, and the absence of dilatory tactics as required by *Rhines v. Weber*, 544 U.S. 269 (2005). Moreover, to the extent such claims allege penalty phase error, they will be moot.

Petitioner failed to raise the claim on direct appeal. *See* Exh. 62. Petitioner argues his default should be excused because he has shown cause and prejudice due to ineffective assistance of appellate counsel.

As set out in *Pollard v. White*, 119 F.3d 1430 (9th Cir. 1997), the "Due Process Clause guarantees a criminal defendant effective assistance of counsel on his first appeal as of right." *Id.* at 1435; *see also Douglas v. California*, 372 U.S. 353, 356–57 (1963). Demonstrating ineffective assistance of counsel under *Strickland* is sufficient to demonstrate "cause" for a Petitioner's procedural default. However, while ineffective assistance of counsel is cause for procedural default, "[a]ttorney error short of ineffective assistance of counsel does not constitute cause." *Vansickel v. White*, 166 F.3d 953, 958 (9th Cir. 1999). "[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when [the] appeal would not have provided grounds for reversal." *See Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001).

The Court must determine whether Petitioner has shown appellate counsel was ineffective by examining first whether Claim 21 would have been meritorious. *Wildman v. Johnson*, 261 F.3d at 840 ("[Petitioner] cannot sustain his claim for ineffective assistance of appellate counsel [when] the issues he raises are without merit"). The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Consequently, where a petitioner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, the petitioner has stated a constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321-24 (1979), which, if proven, entitles him to federal habeas relief. For purposes of determining such claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Where the record supports conflicting inferences, a federal habeas court must presume the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Id.* at 326. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Id.* at 324.

Here, while the state court did not consider this claim on direct appeal, it made factual findings as to whether Petitioner was the shooter during the Bottle Shop incident. Its findings are instructive:

> It is undisputed that defendant was armed with the handgun upon initiating the robbery of the liquor store. After defendant personally removed the money from the cash register his accomplice stated, "Come on. We got the money. Let's get out." Defendant replied, "*No. We're not going to leave any witnesses.*" (Italics added.) Defendant marched the victims back into the rear of the store at gunpoint. He handed the gun to his partner, then twice struck Romero across the head with two full bottles of wine. When Romero pretended to be dead, defendant removed Romero's wallet from his back pocket, felt his back and said, "*We don't have to worry about this guy any more.*" (Italics added.)

> Neither of the surviving victims directly observed defendant regain possession of the gun or fire the ensuing volley of shots. However, Romero testified that defendant's companion, who "had a very boyish look to his face," remained passive throughout the incident and at no time exhibited any threatening or violent behavior. Romero observed *defendant walk over to Zamora and Vasquez* and order the boys to their knees. As the victims pleaded for their lives three shots were fired off in rapid succession; *Vasquez and Zamora were each shot through the front of the head.* The execution-style shooting clearly evinces an intent to kill. The nature and location of the wounds, together with Romero's testimony, strongly supports an inference that defendant momentarily handed the gun to his companion so he could hit Romero over the head with the wine bottles, then took his gun back, stood in front of his victims and fired the shots.

> Defendant used the same handgun several weeks later to rob and twice shoot victim Rose Olveda in the head; the jury concluded from such evidence that he had assaulted her with intent to commit murder. Subsequent to the commission of these offenses defendant remained in possession of the handgun, admitted ownership of it when he sold it to undercover Officer MacIvor, and told the officer it "had done a murder." The jury found that defendant had personally used the gun in connection with the murder of Vasquez, the robbery of Olveda, and the assaults with intent to commit murder upon Romero, Zamora and Olveda.

> In short, the undisputed evidence overwhelmingly establishes that defendant personally shot all of his victims and intended to murder each of them, succeeding in one case. The verdicts and personal gun-use enhancements found true under each count establish that the jury so found; no contrary evidence whatsoever was presented.

*People v. Walker*, 47 Cal. 3d at 632-33 (emphasis in original). In addition, one witness testified that he overheard Petitioner talking about his involvement in a robbery and stating that "some punk got in the way," during the robbery, so he "took him out of the game." *Id.* at 620.

40

Petitioner repeatedly argues that he could not be found to have shot Zamora and Vasquez because no witness explicitly identified Petitioner as the shooter  It is well-established, however, that "'[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Payne v. Borg*, 982 F.2d 335, 341 (9th Cir. 1992), as amended on denial of reh'g (Mar. 3, 1993) (citing *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.1986)).  Based on the Court's independent review of the record and the deference dictated by *Jackson v. Virginia*, the Court concludes the various pieces of evidence outlined above support a finding by the state court that Petitioner failed to show "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 324.  The Court would find Claim 21 unmeritorious.

Accordingly, Petitioner has not shown that he was prejudiced by appellate counsel's failure to raise Claim 21 on direct appeal.  Nor has Petitioner demonstrated or argued that his case satisfies the fundamental miscarriage of justice exception to default.  *See Coleman*, 501 U.S. at 750.  Petitioner's procedural default with respect to Claim 21 is not reviewable in this Court and must remain **DISMISSED**.  In any case, the Court would deny Petitioner's claim on the merits.

### D.    Cumulative Error Claim 22

In Claim 22, Petitioner argues the cumulative effect of the errors identified in his petition, taken as a whole, "resulted in an unfair trial and an unreliable fact-finding process."  *See* Fed. Pet. at 103.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may have a "'substantial and injurious effect' on the jury's verdict" so that a petitioner's conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal).

### 1. Guilt Phase Error

The Court identified only one constitutional error during Petitioner's guilt phase proceedings: Claim 2C. In Claim 2C, Petitioner alleged that counsel was constitutionally ineffective in failing to object to Petitioner's shackling, via knee brace, during trial. *See* Dkt. No. 199. As a result, the Court granted Petitioner habeas relief on Claim 2C. In reversing the Court's order granting Petitioner relief, however, the Ninth Circuit noted that the restraint was "relatively unobtrusive" and was portrayed to the jury as a "more-or-less routine custody measure." *Walker v. Martel*, 709 F.3d at 942. The Ninth Circuit also noted that Petitioner had been convicted on "robust" evidence and it was not reasonably likely that the guilt phase outcome would have been different but for the use of the leg brace. *Id.*

Because the Ninth Circuit has already determined that Petitioner failed to meet his burden of showing prejudice, and Petitioner does not make any new arguments as to prejudice, the Court concludes that Petitioner has not shown the state court's denial of his guilt phase cumulative error claim was unreasonable. *See Richter*, 562 U.S. at 101.

### 2. Penalty Phase

In contrast, the Court has identified several errors during Petitioner's penalty phase of trial. In addition to the shackling error alleged in Claim 2C, which continued into the penalty phase, the Court identified two errors of ineffective assistance of counsel as alleged in Claim 2A and the above-identified portions of Claims 2E and 2F. As discussed in detail above, Petitioner has shown the errors alleged in Claim 2A and certain portions of Claims 2E and 2F were prejudicial to him and that the state court's denial of those claims constituted unreasonable determinations of facts or an unreasonable application of federal law. *See ante* at 23-26 & 31-32.

Based on counsel's egregious ineffective assistance of counsel during every facet of the penalty phase, the Court has no doubt that Petitioner has established cumulative prejudice. Due to counsel's ineffective conduct, Petitioner's penalty phase presentation consisted of the testimony of several unprepared witnesses and did not include the available and compelling mitigating evidence regarding Petitioner's physical, verbal, and psychological abuse, the deaths of Petitioner's siblings, his near-death experience, his family's extreme poverty, his unreliable parents, and

Petitioner's mental health issues. Petitioner's direct examination did not give him the opportunity to tell jurors about the most compelling details of his life. Moreover, counsel's penalty phase closing argument was severely limited and included an affirmative misstatement of the role and weight of aggravating and mitigating factors. "[P]rejudice resulting from ineffective assistance of counsel must be 'considered collectively,'" especially when "the different pieces of mitigating evidence fit into an internally coherent and compelling narrative whole." *Doe v. Ayers*, 782 F.3d 425, 460, n.62 (9th Cir. 2015) (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)). Here, each of counsel's errors related to his near-total failure to conduct any meaningful penalty phase investigation and uncover the considerable trove of compelling mitigating evidence was, alone, enough to prejudice Petitioner. Together, these errors amount to a veritable failure to make any mitigation presentation.

In addition to counsel's deficiencies in investigating, presenting, and arguing a competent case in mitigation, however, counsel was also ineffective when he failed to object to Petitioner's unnecessary shackling. As noted in the Court's prior order granting relief on Claim 2C,

> The appearance of the offender during the penalty phase in shackles . . . almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community—often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point. It also almost inevitably affects the jury's perception of the character of the defendant. . . . And it thereby inevitably undermines the jury's ability to weigh accurately all relevant considerations—considerations that are often unquantifiable and elusive—when it determines whether a defendant deserves death. In these ways, the use of shackles can be a thumb [on] death's side of the scale.

*Deck v. Missouri*, 544 U.S. 622, 633 (2005) (internal citations and quotations marks omitted); Dkt. No. 199 at 21. Indeed, in Petitioner's case, at least one juror had the impression that the shackles were "like a short lead on a vicious dog." Dkt. No. 195. Another juror assumed that Petitioner was shackled "because he had threatened a district attorney." Dkt. No. 199 at 22. However, the Ninth Circuit determined that Petitioner failed to show the state court could not reasonably determine that Petitioner was not prejudiced by the shackling during his penalty phase of trial "given the caliber of the mitigation" evidence presented by counsel. *Walker v. Martel*, 709 F.3d at 944.

1    Given the Court's finding that counsel was ineffective throughout Petitioner's penalty

2    phase proceedings, including in presenting mitigating evidence, the Ninth Circuit's reasoning is no

3    longer applicable.  Most importantly, Petitioner has shown there was considerable and compelling

4    mitigating evidence available at the time of his trial.  As noted, Petitioner's penalty phase jury was

5    forced to weigh multiple execution-style shootings, the death of a special needs victim, and

6    alleged threats against members of law enforcement against scant mitigating evidence that

7    Petitioner "was [nineteen] years old at the time of the offenses, had no prior criminal record, had

8    done yard work for a church secretary in the past, gave a friend rides to work, provided financial

9    and emotional support to his mother and sister, and was loved by them and his girlfriend."  *Walker*

10   *v. Martel*, 709 F.3d at 931.  Had counsel conducted a reasonable investigation, however, the jury

11   would have been able to hear classic mitigation evidence, including the graphic details of

12   Petitioner's "nightmarish childhood," *Williams*, 529 U.S. at 363, which was replete with poverty,

13   violence, illness, and death; Petitioner's continued deep devotion to his family even to his own

14   detriment; and Petitioner's "long-standing" brain damage, which affected his cognitive

15   functioning, Docket No. 130-1 (Exh. J, Dr. Pettis Decl.). at 172.  Moreover, because of counsel's

16   failures to investigate, introduce the proffered evidence, competently examine Petitioner, and

17   construct a competent closing argument using the proffered evidence, the prosecutor was easily

18   able to dismiss Petitioner's scant mitigating evidence and argue to the jury that "the only possible

19   verdict in the case of this particular defendant is the death penalty." RT 3284.  Cumulatively, each

20   of counsel's errors led to a penalty phase presentation with no meaningful showing of mitigating

21   circumstances.  Additionally, counsel's failure to object to Petitioner's unnecessary shackling

22   effectively bolstered the prosecution's argument that Petitioner was violent and dangerous.  *See*

23   RT 3273-3310.  Given that the prosecution's case in aggravation consisted mostly of evidence of

24   future dangerousness, that at least some of the jurors perceived Petitioner's shackling as a

25   reflection of his dangerousness, and that counsel did not make any meaningful showing as to

26   mitigating circumstances, the shackling may very well have placed a "thumb [on] death's side of

27   the scale." *Deck v. Missouri*, 544 U.S. at 633.

28       In sum, based on the significant disparity between the penalty phase trial Petitioner had

44

and that which he could have had but for counsel's ineffective conduct, the Court concludes

Petitioner has shown there was a reasonable likelihood that, but for counsel's ineffectiveness as

identified above, his mitigating evidence may have influenced the jury's appraisal of the

defendant's moral culpability. *Williams*, 529 U.S. at 368-69. While not dispositive, the Court also

notes that, despite counsel's egregious failure to effectively advocate for Petitioner's life, the jury

nevertheless deliberated for "over ten hours over a period of three days" during Petitioner's

penalty phase, suggesting that the jury "'did not find the case to be clear-cut.'" Dkt. No. 199 at 22

(quoting *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999)).

Petitioner has therefore sufficiently shown that the various errors had a "'substantial and

injurious effect' on the jury's [death] verdict." *Alcala v. Woodford*, 334 F.3d at 893-95.

Moreover, these errors "'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'" *Thomas v. Hubbard*, 273 F.3d 1164, 1181 (9th Cir. 2001) (overruled on

other grounds in *Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002). For the reasons outlined

above, Petitioner has also shown the state court's rejection of this claim resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established federal law. 28

U.S.C. § 2254(d); *Richter*, 562 U.S. at 88.

The portion of Claim 22 alleging cumulative error during the penalty phase will be

**GRANTED**.

### IV.    DISPOSITION

There Court hereby ORDERS as follows:

(1) The petition for writ of habeas corpus is **GRANTED** on the basis of the above-

identified portions of Petitioner's ineffective assistance of counsel claims, Claims 2A,

2E, and 2F, as well as Petitioner's penalty phase cumulative error claim, Claim 22.

(2) To the extent indicated in this Order, the remaining portions of Claims 2A, 2E, and 2F

are **DENIED**. To the extent each claim alleges penalty phase error, they are also

**MOOT**. The guilt phase portion of Claim 22 is also **DENIED**.

(3) Claims 16, 19B(e), 19B(f), 19B(aa), 19B(cc), and 21 are procedurally defaulted and,

based on Petitioner's failure to show cause and prejudice, remain dismissed. To the

extent that Claims 16, 19B(e), 19B(f), 19B(aa), and 19B(cc) allege penalty phase errors, they are also **MOOT**. In addition, the Court would deny Claim 21 on the merits.

(4) Petitioner's request that the Court stay his proceedings to allow him to return to state court to exhaust his claims of ineffective assistance of counsel for failure to object to the errors alleged in Claims 16, 19B(e), 19B(f), 19B(aa), and 19B(cc) is **DENIED**.

(5) In view of the Court's grant of the petition, Petitioner is entitled to a new penalty phase trial. Within 120 days of the entry of judgment, the state shall commence proceedings to retry Petitioner's penalty phase in accordance with California law and the United States Constitution.

With the issuance of this order, the petition is fully adjudicated. The clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: December 14, 2018

_____
PHYLLIS J. HAMILTON
United States District Judge